**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| CHARLES STEINBERG, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:18-cv-23786-JEM |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| OPKO HEALTH, INC., PHILLIP FROST, ADAM LOGAL, and JUAN RODRIGUEZ, | |
| Defendants. | |
| IN RE OPKO HEALTH, INC. SECURITIES LITIGATION. | Case No. 1:19-cv-20502-JEM |
| | **JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 2

II.     JURISDICTION AND VENUE .......................................................................... 8

III.    THE PARTIES AND RELEVANT THIRD PARTIES .................................... 9

     A.      Lead Plaintiff ........................................................................................... 9

     B.      Defendants ................................................................................................ 9

     C.      Relevant Nonparties............................................................................... 11

IV.     BACKGROUND AND SUMMARY OF THE FRAUD ................................. 15

     A.      Frost Was Deeply Involved with Opko's Investments and Essential to the Company's Business ................................................................................ 15

     B.      At the Beginning of the Class Period, Investors Became Concerned About Potentially Improper Investment Activity by Frost and Opko, and the Resulting Impact on Opko Shareholders ............................................... 18

     C.      As Opko Shares Declined In Response to These Concerns, Frost and Opko Made Repeated False Denials and Reassuring Statements................................... 26

     D.      Unbeknownst to Investors, Lakewood Was Correct, and Frost's and Opko's Investments in BioZone and MabVax Were Made to Facilitate Illicit Pump-and-Dump Schemes ................................................................................. 29

          1.      Frost, Opko, and Others Engage in the BioZone Pump and Dump.......... 31

          2.      Frost, Opko, and Others Engage in the MabVax Pump and Dump.......... 45

V.      THE TRUTH IS REVEALED........................................................................ 55

VI.     FROST AND OPKO CONSENT TO PENALTIES AND TO EXTRAORDINARY PROPHYLACTIC MEASURES TO PROTECT OPKO FROM FUTURE PENNY-STOCK FRAUDS BY FROST....................................... 59

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER....................................... 62

VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................. 73

     A.      Defendants' Materially False and Misleading Statements and Omissions Issued in Response to the Lakewood Report ....................................... 73

B.    Defendants' Materially False and Misleading Statements Concerning Opko's Investments in BioZone, Cocrystal, and MabVax ................................................. 76

    1.    Defendants' Materially False and Misleading Statements Concerning Opko's Investments in BioZone ................................................. 76

    2.    Defendants' Materially False and Misleading Statements Concerning Opko's Investments in Cocrystal ................................................. 79

    3.    Defendants' Materially False and Misleading Statements Concerning Opko's Investment in MabVax ................................................. 84

C.    Defendants' False and Misleading Statements Concerning Opko's Investment Strategy ................................................. 87

D.    Promotional Articles and Press Releases Discussing Opko's Investments in BioZone and MabVax ................................................. 89

E.    Defendants' Materially False and Misleading Statements Concerning Frost's Investing Prowess and Importance to Opko's Success ................................................. 97

F.    Defendants' Materially False and Misleading Schedule 13Gs ................................................. 99

IX.    LOSS CAUSATION ................................................. 100

X.    PRESUMPTION OF RELIANCE ................................................. 101

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................. 103

XII.    CLASS ACTION ALLEGATIONS ................................................. 103

XIII.    CLAIMS FOR RELIEF ................................................. 105

COUNT I  For Violation Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5  (Against Defendants Opko and Frost) ................................................. 105

COUNT II  For Violations of Section 20(a) of the Exchange Act (Against Defendant Frost) ................................................. 108

COUNT III  For Violation of the Israel Securities Law, 1968 (Against Defendants Opko and Frost for Purchases Made on the TASE) ................................................. 109

XIV.    PRAYER FOR RELIEF ................................................. 115

XV.    JURY DEMAND ................................................. 115

1.      Court appointed Lead Plaintiff, The Amitim Funds ("Lead Plaintiff" or "Amitim," defined below), by its undersigned counsel, brings securities-fraud claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and the Israel Securities Law, 1968, against Defendants Opko Health, Inc. ("Opko" or the "Company") and Phillip Frost ("Frost"). Amitim brings these claims on behalf of a class of investors who purchased or otherwise acquired Opko common stock from September 26, 2013 to September 7, 2018, inclusive, and were damaged thereby.

2.      Amitim alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon the investigation of Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), including: (1) review and analysis of documents filed publicly by Defendant Opko, MabVax Therapeutics Holdings, Inc. ("MabVax"), and BioZone Pharmaceuticals, Inc. ("BioZone") with the Securities and Exchange Commission (the "SEC"); (2) Opko, MabVax, and BioZone press releases and other public statements; (3) transcripts of Opko, MabVax, and BioZone investor conference calls; (4) research reports concerning Opko, MabVax, and BioZone by financial analysts; (5) publicly available information from other legal actions arising out of the occurrences related to this action, including without limitation (a) *SEC v. Honig*, Case No. 18-cv-8175-ER (S.D.N.Y. filed Sept. 7, 2018), (b) *In re MabVax Therapeutics Holdings, Inc.*, Case No. 19-br-10603-CSS (Bankr. D. Del. filed Mar. 21, 2019), and (c) *Pederson v. Frost*, Case No. 17-cv-5580-WMW-BRT (Minn. Dist. Ct. filed Dec. 29, 2017); (6) Lead Counsel's communications with former employees of Opko, MabVax, and BioZone; (7) Lead Counsel's review and analysis of trading data for Opko, MabVax,

and BioZone securities; and (8) other publicly available sources as described below. Lead Counsel's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for further discovery, including a review of documents already produced in other related legal actions arising out of the occurrences giving rise to this action.

## I.  INTRODUCTION

3.      Defendant Phillip Frost enjoyed a reputation as a savvy investor in biotechnology companies and, in fact, was known as the "Warren Buffet of biotech." He served as the CEO and Chairman of Defendant Opko, a publicly traded company that was his "mini Berkshire Hathaway"—the holding company that he used as a vehicle for his investing activities. Frost and Opko publicly portrayed their investments as carefully handpicked by Frost, based on his identification of valuable proprietary technology, and in the best interest of Opko shareholders. Despite this sterling public façade, and unbeknownst to Opko shareholders, Frost and Opko harbored a dark secret. This securities-fraud class action arises from their false statements and omissions concealing their involvement in multiple illicit "pump-and-dump" schemes. In these schemes, Frost, Opko, and several associates used orchestrated trading and false promotional pieces to artificially "pump" up the share price of companies in which they had invested, and then "dumped" their shares by selling them to unsuspecting investors, leaving them holding stock that was, in truth, virtually worthless. In September 2018, after a significant investigation, the SEC charged Frost and Opko with numerous violations of the federal securities laws for this misconduct. When their deep involvement in these pump-and-dump schemes was revealed, the

price of Opko common stock collapsed by more than 30%, causing significant harm to Opko shareholders.

4.      Frost has long invested alongside two individuals named Barry Honig and Michael Brauser. Frost, Honig, and Brauser have invested together in more than a dozen companies since 2009. The trio's ties run long and deep: in addition to their substantial joint investment history, they jointly owned and controlled a company known as Southern Biotech, through which they made many of their investments; they shared a business address in the same building in which Opko is headquartered; and they even used joint letterhead in their business dealings.

5.      However, at the start of the Class Period, Frost's association with Honig and Brauser had begun to raise concern in the market. Honig and Brauser had been the subject of multiple lawsuits accusing them of deceptive investment activity, and questions had arisen as to whether they were "stock promoters" who falsely hyped small-cap companies. In December 2013, investment company Lakewood Capital Management ("Lakewood") published a detailed report titled "Opko Health: The Placebo Effect" (the "Lakewood Report"). The Lakewood Report examined, among other things, Frost's and Opko's deep connections with Honig, Brauser, and other individuals implicated in numerous suspect investments going back years.

6.      As the Lakewood Report detailed, Frost, Opko, Honig, and Brauser were involved in a "web of stock promotion" that should be of "concern" to investors in Opko stock:

> While Dr. Frost is a billionaire who has earned the admiration of the investment community after selling two companies (Key Pharmaceuticals and Ivax Corporation) for incredibly large gains, we also think ***there is another side of his career that should be of great concern to anyone investing in Opko. Dr. Frost has a disturbingly large number of connections to what we believe are two serial stock promoters that have each been the subject of multiple lawsuits, Barry Honig and Michael Brauser*** (who together run an entity called Marlin Capital).
>
> We have counted 16 different penny stocks in which Frost, Honig and Brauser have all invested in recent years, including entities in which Opko is directly involved.

3

7.       The Lakewood Report then detailed examples of litigation against, and suspected fraud by, Honig and Brauser. The Report specifically highlighted Frost's and Opko's investments alongside Honig and Brauser in BioZone, stating that "Opko itself is involved with the penny stock trio through its ownership of 10.9% of BioZone Pharmaceuticals (BZNE). Currently, Frost owns 14.5% of the company, Honig owns 7.9% and Brauser owns 6.8%." The Report questioned whether Opko investors were being deceived as to the nature of Frost's and Opko's investment activities, and whether Opko stock was significantly overvalued as a result.

8.       The Lakewood Report raised serious concern among Opko investors. In the days after Lakewood's criticisms were aired, Opko stock declined significantly on elevated trading volume, falling from approximately $11.63 per share to $9.09 per share between December 9 and December 16, 2013. The financial press reported that "[i]mmediately after the 45-page [Lakewood] [R]eport was published, investors fled OPK stock in droves," and "Opko Health slid 26% lower in just a few days, currently going for under $9."

9.       To stop the decline in Opko's stock price, Frost and Opko flatly denied the allegations in the Lakewood Report. On December 13, 2013, Opko issued a press release stating that the Lakewood Report was "***based on distorted and inaccurate information***," and defending the Company's investments as part of a legitimate and "unique business strategy" that was based on promising "therapeutic and diagnostic product candidates." A few days later, on December 17, 2013, Opko held an investor conference in which it again reassured investors about the legitimacy of its investment activities. Frost assured investors that Opko's investment "strategy is straightforward, though a bit unique. . . . We want to invest in small companies with novel technologies as investments for appreciation as well as for product rights." Frost further told

4

investors that he had "never been associated with a company that presents so much opportunity" as Opko.

10.     Throughout the Class Period, Frost and Opko made a host of other public statements in SEC filings, investor conferences, and the media that were designed to reassure investors. In these statements, they again emphasized that their investment activities were legitimate, were based on the identification of valuable medical technology, and were made to benefit Opko and its shareholders.

11.     For example, in the Company's SEC filings, Frost and Opko stated that their "investments in early stage companies" were based solely on the existence of "valuable proprietary technology and significant potential to create value for OPKO as a shareholder." Several investor presentations during the Class Period pointed to Opko's investment in BioZone—which the Lakewood Report had specifically questioned—as one of Opko's key "Strategic Investments" in "Proprietary Technologies with Significant Upside Potential." Similarly, these presentations highlighted Opko's investment in MabVax—another company in which Honig and Frost had invested together—as an additional example of Opko's legitimate "Strategic Investments" in "Proprietary Technologies with Significant Upside Potential."

12.     Moreover, Frost was quoted in, and authorized, multiple press releases and articles in the financial media that highlighted Frost's and Opko's supposedly legitimate and promising investments in BioZone and MabVax. As detailed further below, these articles proclaimed that "Opko And Its Billionaire CEO Invested In Biozone," and "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics." These articles touted Frost's and Opko's interests in the supposedly promising medical technology that these companies were pursuing and proclaimed that these investments were a path to "meaningful value creation for Opko shareholders."

13.     Unfortunately for investors in Opko stock, these statements were materially false and misleading, and served to conceal a disturbing truth: unbeknownst to investors, Frost and Opko were involved in multiple illicit "pump-and-dump" schemes with Honig and Brauser, including with respect to their investments in BioZone and MabVax. As investors would later learn, and as set forth in detail below, these schemes often followed a familiar pattern.

14.     <u>First</u>, Frost, Honig, and Brauser would secretly obtain control over a publicly traded "shell company."

15.     <u>Second</u>, they would conduct a "reverse merger" of the target company (e.g., BioZone or MabVax) into the publicly traded shell. This maneuver transformed the target company into a publicly traded entity. Reverse mergers have long been considered suspect by the SEC because they allow companies to go public while evading the reporting requirements and scrutiny involved in the more traditional path to obtaining a public listing—an initial public offering.

16.     <u>Third</u>, Frost and his associates would artificially "pump" the price of the publicly traded shares using the following tactics: (a) they would engage in coordinated and often matching trades to create the illusion of trading volume and liquidity in the stock, and (b) they would pay for a publicity-generating event, namely, false promotional articles to be published in a prominent financial website, such as Seeking Alpha. Significantly, these phony, commissioned promotional articles emphasized Frost's and Opko's participation in the investments. This was because—as the "Warren Buffett of biotech"—Frost had a large and devoted following among retail investors, who would buy the stocks of companies he invested in based on their faith in his investing prowess. Frost's and Opko's ability to draw large numbers of retail investors into the "pump" was essential because it enabled Frost and his associates to successfully execute the "dump."

17.     Finally, once the stock price was artificially inflated, Frost's associates and sometimes Frost himself would sell their shares, over weeks or even months, into the wave of retail-investor buying generated by Frost's highly publicized involvement in these companies. Then, the phony promotional activity and coordinated trading would cease, and the prices of the target companies would decline significantly, leaving these retail investors holding the nearly worthless shares.

18.     Investors in Opko stock did not learn the truth about this misconduct until September 7, 2018. On that day, the SEC charged Frost, Opko, Honig, Brauser, and multiple additional entities controlled by Frost with a litany of violations of the federal securities laws for engaging in multiple "'pump-and-dump' schemes . . . that . . . left retail investors holding virtually worthless shares." The SEC's complaint ("SEC Complaint") was filed after significant investigation and included quotes from multiple internal emails and other documents. It recounted in great detail the multiple pump-and-dump schemes perpetrated by Frost, Opko, and their associates—including with respect to their supposedly legitimate investments in BioZone and MabVax.

19.     The market immediately recognized that Defendants' strenuous denials of the Lakewood Report—and their ensuing reassuring statements about Opko's purportedly legitimate investments in BioZone and MabVax—were false. Opko's stock price swiftly collapsed. On September 7, 2018, Opko stock declined from a price of $5.59 per share to $4.58 per share—a decline of approximately 18%—on extremely high volume. Approximately 35 minutes after the SEC filed its complaint, the Nasdaq halted trading of Opko in light of the precipitous decline in Opko's share price.

20.     Trading was frozen for a full week given the extraordinary nature of these revelations. When trading resumed on September 14, 2018, Opko shares continued to plunge, falling to $3.90 per share—a decline of another 15%. Overall, in less than two trading days following the revelation of Frost and Opko's participation in the pump-and-dump schemes, Opko shareholders lost nearly $1 billion in market capitalization as a result of the false and misleading misstatements detailed in this complaint.

21.     In December 2018, Frost and Opko entered into consent judgements with the SEC. Frost agreed to pay more than $5.5 million to the SEC, which included disgorgement of ill-gotten gains and a significant fine. In its consent judgment, Opko agreed to substantial corporate-governance reforms designed to protect its shareholders against any future misconduct by Frost. Among other things, Opko agreed to establish an Independent Investment Committee to vet and handle Opko's "strategic minority investments for so long as Dr. Phillip Frost is a shareholder in or holds any management or Board-level position" at Opko. Opko's stock price has never recovered, and currently trades at approximately $2.36 per share.

22.     Lead Plaintiff brings this action to recover the Class's damages caused by Frost and Opko's false and misleading statements and omissions about their participation in the fraudulent pump-and-dump schemes.

## II.     JURISDICTION AND VENUE

23.     The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over Count III under 28 U.S.C. § 1367(a).

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Opko is headquartered and transacts business in Miami, Florida, and a substantial part of the events giving rise to this litigation took place in this District, including the dissemination of many of the false statements at issue.

## III.     THE PARTIES AND RELEVANT THIRD PARTIES

### A.     Lead Plaintiff

25.     Lead Plaintiff The Amitim Funds is the largest institutional investor in Israel by assets under management and consists of five related Israel-based pension funds: Mivtachim The Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Keren Makefet Pension and Provident Center Cooperative Society Ltd., The Hadassah Workers Pension Fund Ltd., and The "Egged" Members Pension Fund Ltd. The Amitim Funds have combined current assets under management of approximately $100 billion, 129,000 active members, 236,000 benefit recipients, and an additional 800,000 inactive members. They make annual pension contributions and payments of over $4 billion. Amitim purchased Opko common stock on the New York Stock Exchange, the Nasdaq and the Tel Aviv Stock Exchange (the "TASE") during the Class Period and was damaged by Defendants' conduct as alleged in this complaint.

### B.     Defendants

26.     Defendant Opko is a publicly traded Delaware corporation with its principal place of business in Florida. It was formed in 2007 after the merger of three pharmaceutical companies: Acuity, Froptix, and eXegenics. Opko is a diversified healthcare company that, among other things, has multiple investments in developing companies. In addition to developing its own products, Opko frequently acquires or takes significant stakes in smaller healthcare companies that are purportedly focused on developing new products. Opko is run by Defendant Phillip Frost, a

billionaire pharmaceutical executive who serves as Opko's Chairman and Chief Executive Officer ("CEO"). Throughout the Class Period, Opko—in conjunction with Defendant Frost and others, as described below—touted its "strategic investments" in "early-stage companies" that would purportedly generate growth and therefore value for Opko shareholders. In reality, as detailed in this complaint, many of these investments were part of fraudulent pump-and-dump schemes carried out by Frost and his associates. After substantial investigation, Opko was charged by the SEC in September 2018 with violating the federal securities laws for the misconduct alleged in this complaint. In December 2018, Opko agreed to a consent judgment, as further described below.

27.     Defendant Phillip Frost is the Chairman, CEO, and largest shareholder of Opko. Frost presently controls approximately 35% of Opko's shares both directly and through the Frost Gamma Investment Trust and The Frost Group (defined below). Frost became the CEO of Opko in March 2007 and has a long history of involvement in pharmaceutical companies, both as an investor and as a company executive or outside director. Before becoming the CEO of Opko, Frost was the CEO of eXegenics, Inc., IVAX Corporation ("Ivax"), and Teva Pharmaceutical Industries ("Teva"). He has also served as a director of Cocrystal, Inc. and Castle Brands Inc. Opko's SEC filings throughout the Class Period touted Frost's long history of experience in the pharmaceutical industry and stated that Frost was "essential" to Opko's business. As Opko also represented throughout the Class Period, Frost was Opko's "chief operating decision-maker." Throughout the Class Period, Frost made false statements concerning Opko's investments, including its investments in pharmaceutical companies BioZone and MabVax (defined below). After substantial investigation, Frost was charged by the SEC in September 2018 with violating numerous provisions of the federal securities laws for the misconduct alleged in this complaint. In December 2018, Frost agreed to a consent judgment, under which he agreed to pay disgorgement,

interest, and a civil penalty totaling $5.5 million and to be permanently enjoined from participating in any offering of "penny stock" (i.e., generally any equity security that has a price of less than $5.00, as provided in SEC Rule 3a51-1), with limited exceptions.

**C.    Relevant Nonparties**

28.    Barry Honig ("Honig") is a serial stock promoter who facilitated Frost's and Opko's pump-and-dump schemes by coordinating the purchase and sale of stock in BioZone and MabVax by Frost and Frost's associates, negotiating transactions, and engaging in promotional activity. Honig, along with Stetson and Groussman (defined below), participated in the BioZone and MabVax pump-and-dump schemes by purchasing publicly traded shell companies for reverse mergers with BioZone and MabVax. Honig also participated in the MabVax pump-and-dump and facilitated Opko's participation in MabVax's financing in 2015. Honig was charged by the SEC in September 2018 with violating numerous provisions of the federal securities laws for the misconduct alleged in this complaint. On April 26, 2019, the SEC announced that "Honig and the Commission staff reached an agreement in principle to settle the Commission's claims for liability."

29.    John Stetson ("Stetson") is an investor who worked closely with Honig and Groussman (defined below) to, along with Opko, Frost, and Frost's associates, participate in the pump-and-dump schemes described in this complaint. Stetson secured substantial ownership of BioZone and MabVax, engaged in fraudulent promotional activity and stock trading to artificially inflate the companies' stock prices, and then sold his interests in those companies for personal financial gain. Stetson was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint.

30.    Michael Brauser ("Brauser") is an investor who worked closely with Stetson and Groussman, along with Opko and Frost and his associates, to secure substantial ownership of

BioZone and MabVax before engaging in fraudulent promotional activity and stock trading to artificially inflate the companies' stock prices before selling his interest in those companies for personal financial gain. Brauser was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint.

31.     John Ford ("Ford") is a stock promoter who frequently published articles on Seeking Alpha, a popular website for investors. In order to inflate BioZone's and MabVax's stock prices, in conjunction with Frost and his associates, Ford published false articles on Seeking Alpha promoting BioZone and MabVax, which included materially false and misleading statements about Opko and were disseminated to Opko investors. In exchange for this promotional activity, Ford accepted below-market-price shares of BioZone stock, which he traded after publishing his articles as part of Defendants' effort to create the appearance of investor interest in BioZone. Ford was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint, and agreed to a consent judgment enjoining him from violating the securities laws and imposing a civil penalty in an amount to be set by the court.

32.     John O'Rourke ("O'Rourke") was, throughout the Class Period, the President and CEO of Riot Blockchain, Inc., a company purportedly focused on developing blockchain technology. As part of Defendants' pump-and-dump schemes, O'Rourke, in conjunction with Frost and Frost's associates, instructed Ford to publish fraudulent articles about BioZone and MabVax to artificially inflate the companies' stock price. Those articles included materially false and misleading statements about Opko and were disseminated to Opko investors. O'Rourke, along with Frost, Opko, and Ford, traded BioZone stock following the publication of the articles. O'Rourke was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint.

33.     Brian Keller ("Keller") is BioZone's Chief Scientific Officer. Keller worked in tandem with Frost and Frost's associates to perpetrate their BioZone pump-and-dump scheme while concealing it from investors. For example, as a way to legitimize Frost's and Opko's investments and conceal the scheme, Keller was quoted throughout one of Ford's fraudulent Seeking Alpha articles as touting BioZone technology that was not actually in development. Keller was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint. In March 2019, Keller agreed to a consent judgment enjoining him from violating the securities laws, to be enjoined from participating in any offering of penny stock, and imposing a civil penalty in an amount to be set by the court.

34.     Mark Groussman ("Groussman") is an investor who worked closely with Stetson and Brauser to, along with Opko, Frost, and Frost's associates, secure substantial ownership of BioZone and MabVax. Groussman also engaged in fraudulent promotional activity and stock trading to artificially inflate the companies' stock prices before selling his interests in those companies for personal financial gain. Groussman was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint, and has agreed to a consent judgment (along with his investment vehicle, Melechdavid) under which Groussman agreed to pay $1,051,360 of disgorgement of ill-gotten gains, $170,555 of interest, and a penalty of $160,000, is permanently enjoined from violating the securities laws, and is enjoined for five years from participating in any penny-stock offering.

35.     Southern Biotech Inc. ("Southern Biotech") was a privately held company owned and controlled by Defendant Frost, as well as Honig and Brauser. Frost and his associates used Southern Biotech as a tool through which some of their investments in MabVax could be funneled

13

to avoid disclosure of those investments. Southern Biotech was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint.

36.     Frost Gamma Investment Trust ("FGIT") is one of Defendant Frost's primary investment vehicles. Defendant Frost is the trustee of FGIT. FGIT, along with Opko and Frost, was charged by the SEC with participating in pump-and-dump schemes at BioZone and MabVax. Frost and his associates used FGIT to acquire substantial ownership of and fraudulently trade in BioZone and MabVax stock before engaging in fraudulent promotional activity to inflate and sell their stock. Despite Frost's ownership interest in MabVax as an individual and through Opko and FGIT, during the Class Period, FGIT represented in its Schedule 13Gs that it was only a passive investor in MabVax. FGIT was charged by the SEC for violations of the federal securities laws for the misconduct alleged in this complaint. In December 2018, FGIT agreed to a consent judgment with the SEC, under which it is permanently enjoined from violating the securities laws and from participating in any offering of penny stock.

37.     The Frost Group, LLC is a private-equity firm specializing in private-investment-in-private-equity ("PIPE") investments (i.e., purchases of shares of publicly traded stock directly from the company at below-market prices). It was founded in 2006 and is based in Miami, Florida. Frost, Brauser, and Honig were all members of The Frost Group and caused The Frost Group to invest in BioZone as part of Frost's and his associates' efforts to secure substantial ownership over BioZone.

38.     BioZone Pharmaceuticals, Inc. ("BioZone") is a pharmaceutical company led by Brian Keller. It is now known as Cocrystal Pharma, Inc. ("Cocrystal") following a merger of BioZone and Cocrystal Discovery, Inc. on January 2, 2014. As part of their pump-and-dump scheme, in 2010, Frost and his associates approached BioZone management and proposed a

reverse merger. BioZone's post-merger filings with the SEC never disclosed Frost's colleagues—including Honig and Brauser—as control persons, but by the beginning of the Class Period, Frost, his associates, FGIT, and The Frost Group owned approximately 45% of BioZone. In the fall of 2013, Frost and his associates instructed Ford to publish false articles about BioZone and the status of its new product development, causing BioZone's stock price to increase. They then sold their interests in BioZone for personal financial gain.

39.     MabVax Therapeutics Holdings, Inc. ("MabVax") is a biotechnology company purportedly focused on the clinical development of new cancer treatment products. MabVax was another company that Frost and his associates "pumped and dumped." After Honig facilitated a reverse merger between MabVax and a publicly traded shell company in July 2014, Opko, Frost, and Frost's associates gained a controlling ownership interest in MabVax through Series D and Series E private placements carried out in March and April 2015, while never disclosing their relationship and shared interests to MabVax or to the public.

## IV.     BACKGROUND AND SUMMARY OF THE FRAUD

### A.     Frost Was Deeply Involved with Opko's Investments and Essential to the Company's Business

40.     Through decades of investing in, and serving as an executive and director of, several pharmaceutical companies, Defendant Frost has developed a reputation as a savvy investor in biotechnology. Frost served as the Chairman of Key Pharmaceuticals, which he sold for $836 million in 1986; the Chairman and CEO of Ivax, which he sold to Teva in 2005 for $7.6 billion; and, after the Ivax sale, the Vice Chairman and then Chairman of Teva. As noted above, Defendant Frost is known as the "Warren Buffett of biotech."

41.     Frost created Opko in 2007. Among other things, Opko serves as a holding company for various Frost-directed investments in biotech companies. In January 2017, *Forbes*

published an article titled "The Buffett of Biotech's Portfolio," in which it reported that Frost, through Opko, "is building a health-care-focused Berkshire Hathaway." As Oracle Partners' Larry Feinberg, a hedge-fund manager who has invested in Frost's companies since the 1990s, told *Forbes*, Frost "views Opko as his holding company. It is his Berkshire Hathaway of health care."

42.     As *Forbes* described, Frost has "the mind-set of a savvy value investor, only it's enhanced by a deep understanding of molecular biology and a penchant for swiftly striking opportunistic deals." Frost personally evaluates and monitors these investments: "His office desk is stacked with pitchbooks and proposals, as well as dual flat-panel Bloomberg screens, with dozens of stocks on his watch list blinking green and red." During the Class Period, Frost regularly discussed potential transactions and investments during daily lunches with senior Opko executives, including Executive Vice President (and Opko director) Steve Rubin, whom *Forbes* described as "Frost's deals guy," and Adam Logal, Opko's Senior Vice President and CFO, whom *Forbes* described as "Frost's liaison to Wall Street."

43.     Opko has repeatedly represented in its public SEC filings that the value proposition for investors in its stock derives principally from Frost and, in particular, Frost's involvement in (and control over) the Company's investment activities. Time and again, the Company emphasized that Frost's involvement in Opko's investment activities—as well as his sterling reputation—were critical to Opko's success. Opko stated throughout the Class Period (including, for example, in the Company's 2013 Form 10-K filed on March 3, 2014) that its "success is dependent to a significant degree upon the involvement, efforts and reputation of our Chairman and Chief Executive Officer, Phillip Frost, M.D." The Company has further described Frost's reputation and his participation in Opko's investments as "essential to our business":

> Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities ***and assists both in negotiations with***

16

*acquisition targets, investment targets and potential joint venture partners*. . . . *If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock*. . . .

44.     Since Opko's creation, Frost has exercised total control over Opko. He has continuously served as the Company's CEO and Chairman and has been Opko's largest shareholder. He presently owns or controls approximately 35.7% of Opko's common shares through his personal holdings and those of FGIT (of which Frost is the trustee), Frost Nevada Investments Trust (of which Frost is the sole trustee), The Frost Group, and the Phillip and Patricia Frost Philanthropic Foundation, Inc. (which is controlled by Frost and his wife). Frost has selected each member of Opko's Board. Opko also stated in its SEC filings during the Class Period that Frost is the Company's "chief operating decision-maker ('CODM')."

45.     In its SEC filings, the Company has stated that it is controlled by Frost in all respects. For example, in its 2013 Form 10-K, the Company stated that FGIT beneficially owned approximately 40% of Opko common stock and, "[a]s a result, Dr. Frost[,] acting with other members of management, would have the ability to control the election of our Board of Directors, the adoption or amendment of provisions in the Company's Certificate of Incorporation, the approval of mergers and other significant corporate transactions, and the outcome of issues requiring approval by our stockholders." Frost's control over Opko extends even to its real-estate and airplane leases. As stated in the Company's 2013 Form 10-K and elsewhere, Opko's "principal corporate office is located at 4400 Biscayne Blvd, Miami, Florida. We lease this space from Frost Real Estate Holdings, LLC ('Frost Real Estate'), an entity which is controlled by Dr. Phillip Frost," and Opko "reimburse[s] Dr. Frost for Company-related use by Dr. Frost and our other executives of an airplane owned by a company that is beneficially owned by Dr. Frost."

**B.** **At the Beginning of the Class Period, Investors Became Concerned About Potentially Improper Investment Activity by Frost and Opko, and the Resulting Impact on Opko Shareholders**

46.     Frost has a long history of investing with the individuals he conspired with to execute the pump-and-dump schemes described in this complaint, and is intimately familiar with the particular tactics that were employed in the schemes. Frost has collaborated with Honig and Brauser on investments in companies since at least 2009. These investments have involved many of the same mechanisms that Frost, Honig, and Brauser used for their pump-and-dumps of BioZone and MabVax stock.

47.     The SEC has stated that

Honig, Brauser, Stetson and O'Rourke, individually or through their entities, invested alongside one other in at least 19 issuers at or about the same time, from 2001 to the present. [I]n most cases in which Honig, Brauser, Stetson and O'Rourke co-invested, the investments followed a pattern: Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices. Honig, Brauser, Stetson and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions. When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create a market demand and trading volume that would allow them to sell their positions. ***Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake—for example, an acquisition or merger, or a new investment by a well-known investor, like [Frost]—and paid writers, bloggers, or other public relations professionals to write about it.*** Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions—generally staggered over a course of weeks—into the artificially inflated market.

48.     In one of their earliest investments, Brauser brought Frost into an investment in ChromaDex Corp. ("ChromaDex") in September 2009. Frost, Brauser, and Honig also co-invested in companies including uSell.com, Fuse Science, Inc., MusclePharm, Levon Resources (since rebranded as VBI Vaccines, Inc.), and Izea Worldwide, Inc. Frost and Honig also invested together

18

in Sevion Therapeutics (since rebranded as Eloxx Pharmaceuticals, Inc.), Fluent, Inc., Internet Patent Corporations (since rebranded as Prism Technologies Group, Inc.), Orbital Tracking Corporation, and Bullfrog Gold Corporation.

49.     In addition, Honig served as the Chairman of Sagebrush Gold, Ltd. (later known as Pershing Gold Corporation) in September 2011, when Sagebrush issued warrants to FGIT to purchase 9,853,188 shares of stock. Pershing later stated in a November 2013 S-1 Registration statement that it relied on cash infusions from FGIT and Honig to fund operations.

50.     Honig and Brauser also hold interests in entities that share office space with Frost's entities. Honig is the president and CEO, and Brauser is the executive director, of Three Kings of Queens, Inc. ("TKoQ"), which was located at 4400 Biscayne Boulevard, Suite 850, Miami, FL 33137, a building owned by Frost, throughout the Class Period. Frost's investment trust, FGIT, is also located in the same suite, and Opko's headquarters is located in the same building.

51.     As the SEC has discussed, Frost, Honig, and others frequently used a shared company—Southern Biotech—to conceal their coordinated investing activity. Southern Biotech, which was incorporated in 2014 and dissolved in 2017, was co-owned by Frost, Honig, and Brauser. The three used Southern Biotech to invest in public companies, frequently alongside investments by some or each of Frost, Honig, and Brauser individually, including in the case of MabVax. The SEC specified that "Honig used Southern Biotech as an entity through which he, Brauser and [Frost] could each funnel their investments in issuers, including [MabVax], thus shielding the size of their individual investments from disclosure."

52.     Frost, Honig, and Brauser also used shared letterhead to undertake their illicit investment activities. The SEC described how Honig, Brauser, and Frost acted as a coordinated

investing entity with respect to BioZone, sending BioZone management a Letter of Intent in January 2011 on "Honig, Brauser, Frost Group" letterhead.

53.     Frost also has a history of engaging in the practice of paying for promotional articles with these individuals (without disclosing the fact of the payments), and did so both before and during the Class Period. Honig and Ford met in 2012 and, after agreeing that Honig would secretly compensate Ford in exchange for promotional articles about companies that Honig identified, the two engaged in various transactions to covertly pay Ford approximately $90,000. Ford then began writing promotional articles, including promotional articles about Frost and Opko. Specifically, in September 2012, Ford published a promotional article about Frost, which included an interview by Ford of Frost that Stetson had arranged. In addition, in November 2013, Honig sent an email to Brauser and O'Rourke detailing a promotional plan for Opko, including an article by Ford that Honig noted "we are assisting" on. Later, during the Class Period, Frost and his associates commissioned Ford to write false and misleading promotional articles—which emphasized Frost's involvement—to help effectuate the BioZone and MabVax pump-and-dump schemes.

54.     As alleged in Sections IV(B) and VII below, Honig committed, and was suspected of, securities-law violations during the time when he and Frost were frequent co-investors. Accordingly, by December 2013, Frost's and Opko's long history of association with these suspicious figures triggered intense market scrutiny.

55.     On December 11, 2013, investment company Lakewood Capital Management ("Lakewood") published a report titled "Opko Health: The Placebo Effect" (the "Lakewood Report"). This Report examined, among other things, Frost's and Opko's deep connections and investment history with Honig, Brauser, and other individuals implicated in a number of suspect

investments and business dealings going back years. In light of these connections, the Lakewood

Report questioned whether Opko stock was significantly overvalued, and whether its investors

were being deceived as to the nature of Frost's and Opko's investment activities.

56.     The Executive Summary of the Lakewood Report summarized the bases for

Lakewood's conclusion that Opko's "shares are as disconnected from reality as any company we

have ever seen," including:

- the Company's history of failures, disappointments and **_overhyped
  opportunities_**; . . .

- unrealistically bullish and perennially incorrect analyst forecasts from
  related and biased parties;

- **_concerning affiliations between the Company's management and what we
  believe are serial stock promoters; and_**

- a cult-like following in the stock largely based on regular insider purchases
  that we believe are a red herring to drum up retail investor buying.

57.     As the Lakewood Report detailed, Frost's seemingly legitimate business career

occurred right alongside a history intertwined with disreputable characters (including Honig and

Brauser) and a "web of stock promotion" that should be of "concern" to investors in Opko stock:

> While Dr. Frost is a billionaire who has earned the admiration of the investment
> community after selling two companies (Key Pharmaceuticals and Ivax
> Corporation) for incredibly large gains, we also think **_there is another side of his
> career that should be of great concern to anyone investing in Opko. Dr. Frost has
> a disturbingly large number of connections to what we believe are two serial stock
> promoters that have each been the subject of multiple lawsuits, Barry Honig and
> Michael Brauser_** (who together run an entity called Marlin Capital).
>
> **_We have counted 16 different penny stocks in which Frost, Honig and Brauser
> have all invested in recent years, including entities in which Opko is directly
> involved. In fact, the business address listed for Honig and Brauser, 4400
> Biscayne Blvd., is owned by Dr. Frost and is also the offices of Opko Health,_**
> Ladenburg Thalmann (again, where Dr. Frost is Chairman) and numerous other
> companies in which Frost, Honig, and/or Brauser are involved (including
> MusclePharm, **_BioZone_**, SafeStitch Medical, Non-Invasive Monitoring Systems
> and others). **_In fact, Barry Honig's office is listed as being in the exact same suite_**

> ***<u>(Suite 850)</u> of 4400 Biscayne Blvd. as Dr. Frost's Frost Gamma Investments Trust.***
>
> We have found **<u>38</u>** different stocks connected to Barry Honig and **<u>15</u>** connected to Michael Brauser (there are likely many more, but this is what we could track down). Only three of these companies have a market capitalization above $150 million, only **<u>one</u>** of these companies generates a profit… (Pyramid Oil), which only makes around $1 million per year. Many of these companies have cost investors a significant amount of money and ***both individuals have been the subject of extensive litigation***.

58.     The Lakewood Report included a chart listing companies in which Frost, Opko, or both had invested alongside Honig, Brauser, or both:

## List of Opko, Frost, Honig and Brauser Holdings

| | Ticker | Local Share Px | USD Mkt Cap | Opko Shares | $mm | % Out | Date | Frost Shares | $mm | % Out | Date | Honig (13) Shares | $mm | % Out | Date | Brauser Shares | $mm | % Out | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **"Core" Holdings** | | | | | | | | | | | | | | | | | | | |
| Opko | OPK | $11.10 | $4,455 | | | | | 172.8 | 1,918 | 36.8% | 3/29/13 | | | | | | | | |
| Teva | TEVA | $39.47 | $33,352 | | | | | 14.6 | 576 | 1.7% | 12/3/13 | | | | | | | | |
| Ladenburg | LTS | $3.40 | $613 | | | | | 54.8 | 186 | 30.4% | 8/15/13 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Opko-Related Public Entities** | | | | | | | | | | | | | | | | | | | |
| BioZone (1) | BZNE | $0.62 | $44 | 7.7 | 5 | 10.9% | 3/29/13 | | | | | 5.5 | 3 | 7.9% | 9/11/13 | 4.7 | 3 | 6.8% | 3/29/13 |
| ChromaDex (2) | CDXC | $1.18 | $124 | NA | 2 | 1.5% | 9/30/13 | 15.3 | 18 | 14.6% | 6/20/12 | 8.0 | 9 | 7.6% | 4/30/13 | 8.2 | 10 | 7.9% | 5/13/13 |
| RXi Pharmaceuticals | RXII | $2.85 | $33 | 2.2 | 6 | 19.2% | 3/12/13 | 0.2 | 1 | 2.0% | 3/12/13 | | | | | | | | |
| Sorrento Therapeutics | SRNE | $8.85 | $192 | 2.2 | 19 | 9.9% | 11/26/13 | 0.1 | 1 | 0.7% | 9/13/12 | | | | | | | | |
| Neovasc | NVC CN | 4.25 | $205 | 2.0 | 8 | 6.0% | 2011 | 14.8 | 59 | 30.7% | 5/6/13 | | | | | | | | |
| Arno Therapeutics | ARNID | $3.00 | NA | 0.1 | 0 | 0.5% | 10/29/13 | | | | | | | | | | | | |
| Tesaro | TSRO | $37.65 | $1,232 | NA | 12 | 1.0% | 9/30/13 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Other Public Entities** | | | | | | | | | | | | | | | | | | | |
| Passport Potash | PPI CN | 0.06 | $11 | | | | | 30.1 | 2 | 16.4% | 10/15/12 | 15.3 | 1 | 8.3% | 7/29/13 | 10.5 | 1 | 5.7% | 7/29/13 |
| SafeStitch Medical (3) | SFES | $1.64 | NA | | | | | 13.1 | 22 | 7.8% | 9/6/13 | NA | NA | NA | 9/6/13 | NA | NA | NA | 9/6/13 |
| uSell.com (4) | USEL | $0.18 | $13 | | | | | 4.6 | 1 | 6.2% | 12/31/12 | 3.3 | 1 | 4.5% | 12/31/12 | 7.5 | 1 | 10.1% | 10/31/13 |
| Castle Brands (5) | ROX | $0.80 | $89 | | | | | 33.5 | 27 | 30.0% | 7/2/13 | 0.0 | 0 | NA | 8/15/11 | 0.0 | 0 | NA | 8/15/11 |
| Document Security Sys (6) | DSS | $2.03 | $100 | | | | | 0.6 | 1 | 1.2% | 11/1/13 | 1.4 | 3 | 2.6% | 11/1/13 | 0.1 | 0 | NA | 11/1/13 |
| IZEA | IZEA | $0.29 | $6 | | | | | 0.5 | 0 | 2.1% | 12/31/12 | 0.4 | 0 | 2.0% | 11/13/12 | | | | |
| Pershing Gold (7) | PGLC | $0.35 | $96 | | | | | 53.0 | 19 | 19.4% | 6/25/13 | 27.7 | 10 | 10.1% | 12/5/13 | | | | |
| Anfield Resources | ARY CN | 0.27 | $1 | | | | | 0.4 | 0 | 8.1% | 3/24/12 | | | | | 0.2 | 0 | 4.4% | 3/15/11 |
| MusclePharm (1) | MSLP | $7.64 | $68 | | | | | 0.7 | 6 | NA | 2/5/13 | 0.3 | 3 | 3.7% | 5/8/13 | | | | |
| Bullfrog Gold | BFGC | $0.15 | $7 | | | | | 2.3 | 0 | NA | 5/6/13 | 3.6 | 1 | 8.0% | 11/10/12 | | | | |
| Fuse Science (8) | DROP | $0.03 | $7 | | | | | NA | NA | NA | 11/8/13 | NA | NA | NA | 11/8/13 | NA | NA | NA | 11/8/13 |
| Non-Invasive Monitoring | NIMU | $0.30 | $24 | | | | | 15.0 | 4 | 19.0% | 4/8/13 | | | | | | | | |
| Tiger Media | IDI | $1.30 | $42 | | | | | 9.0 | 12 | 28.0% | 7/10/13 | | | | | | | | |
| Tiger X Medical | CDOM | $0.10 | $23 | | | | | 33.3 | 3 | 14.4% | 4/20/10 | | | | | | | | |
| Winston Pharmaceuticals | WPHM | $0.01 | $1 | | | | | 0.0 | 0 | 0.0% | 5/19/10 | | | | | | | | |
| Silver Horn Mining (9) | SILV | $0.02 | $5 | | | | | 19.0 | 0 | 7.5% | 11/26/13 | 25.3 | 1 | 10.0% | 11/26/13 | 25.3 | 1 | 10.0% | 11/26/13 |
| California Gold | CLGL | $0.00 | $0 | | | | | | | | | 8.2 | 0 | 5.3% | 5/23/13 | 3.0 | 0 | 1.9% | 5/23/13 |
| Pyramid Oil | PDO | $4.77 | $22 | | | | | | | | | 0.3 | 1 | 5.9% | 6/3/13 | 0.3 | 1 | 6.1% | 9/13/13 |
| Senesco Technologies | SNTI | $4.85 | $15 | | | | | | | | | 0.3 | 1 | 9.5% | 10/2/13 | 0.2 | 1 | 5.7% | 12/6/13 |
| Adex Media | ADXM | $0.00 | $0 | | | | | | | | | 2.3 | 0 | 7.2% | 8/7/09 | | | | |
| Allicua | ALQA D | $7.21 | $87 | | | | | 0.3 | 2 | 2.2% | 10/30/13 | | | | | | | | |
| BroadVision (10) | BVSN | $9.89 | $47 | | | | | | | | | 0.0 | 0 | 0.1% | 10/24/11 | | | | |
| Cadir | CDZI | $6.05 | $98 | | | | | 0.8 | 5 | 4.9% | 9/23/13 | | | | | | | | |
| Clear Skies Solar | CSKH | $0.00 | $0 | | | | | | | | | 11.2 | 0 | 4.9% | 8/9/10 | | | | |
| Genius Brands | GNUS | $0.05 | $30 | | | | | | | | | 6.2 | 0 | 1.1% | 9/6/13 | | | | |
| Internet Patents | PTNT | $3.18 | $25 | | | | | | | | | 0.3 | 1 | 4.1% | 11/12/13 | | | | |
| Janus Resources | JANI | $0.89 | $56 | | | | | | | | | 5.6 | 5 | 8.9% | 10/22/10 | | | | |
| Marathon Patent Group (9) | MARA | $5.95 | $32 | | | | | | | | | 0.2 | 1 | 4.6% | 10/29/13 | | | | |
| Oculus Innovative Sciences | OCLS | $4.30 | $29 | | | | | | | | | 0.0 | 0 | 0.0% | 4/18/13 | | | | |
| Paulson Capital | PLCC | $1.01 | $6 | | | | | | | | | 0.5 | 0 | 7.9% | 10/8/13 | | | | |
| PLC Systems | PLCSF | $0.05 | $7 | | | | | | | | | 10.8 | 0 | 6.7% | 9/23/13 | | | | |
| Spherix (11) | SPEX | $8.92 | $22 | | | | | | | | | 0.2 | 1 | 6.9% | 9/26/13 | | | | |
| Vector Group | VGR | $16.56 | $1,564 | | | | | 12.8 | 212 | 13.5% | 11/16/12 | | | | | | | | |
| Wi-Troo (12) | WTRO | NA | NA | | | | | | | | | 1.7 | 0 | NA | 6/9/06 | 1.2 | 0 | 1.6% | 8/11/05 |
| Wright Investors' Service | WISH | $2.10 | $39 | | | | | 1.3 | 3 | 7.3% | 12/31/12 | | | | | | | | |
| YesDTC Holdings | YESD | $0.00 | $0 | | | | | | | | | 13.4 | 0 | 4.9% | 8/23/11 | | | | |
| Pluristem | PSTI | $3.25 | $207 | | | | | | | | | 0.5 | 2 | 5.7% | Q4'08 | 0.0 | 0 | NA | 2007 |
| Cell Power Technologies | CPWT | NA | NA | | | | | | | | | 1.7 | NA | 7.8% | 8/11/06 | | | | |
| Dara Biosciences | DARA | $0.49 | $15 | | | | | | | | | 0.3 | 0 | 1.0% | 10/24/10 | | | | |
| Cadus | KDUS | $1.65 | $22 | | | | | | | | | 0.6 | 1 | 4.5% | 11/22/13 | | | | |
| Purple Beverage | PPBV | $0.00 | $0 | | | | | | | | | 4.1 | 0 | 6.7% | 12/12/07 | | | | |
| American DG Energy | ADGE | $1.58 | $77 | | | | | 2.6 | 4 | 5.4% | 9/4/13 | | | | | | | | |
| Ascent Solar Tech | ASTI | $0.72 | $42 | | | | | | | | | 0.0 | 0 | 0.0% | 11/27/12 | | | | |
| IsoRay | ISR | $0.51 | $20 | | | | | | | | | 0.0 | 0 | 0.0% | 7/16/12 | | | | |
| NeuraIstem | CUR | $2.54 | $195 | | | | | | | | | 2.1 | 5 | 3.9% | 9/10/12 | | | | |
| WPCS International | WPCS | $3.01 | $4 | | | | | | | | | 0.1 | 0 | 10.0% | 11/26/13 | | | | |

☐ Denotes companies in which Frost plus Honig and/or Brauser are involved

### Notes

(1) In August 2013, MSLP bought $2mm convert plus warrants from BioZone; MSLP leases office space at 4400 Biscayne Blvd (Frost's building)
>> Frost/Honig/Brauser sued by BioZone original founder
>> BioZone selling substantially all assets to MSLP and merging with Cocrystal Discovery
(2) Honig and Brauser are co-chairmen of the board of ChromaDex
(3) SFES merged with TransEnterix on 9/3/13 -- per the 8-K, TransEnterix's former stockholders now own approximately 65% of the company on a fully diluted basis
>> Company also did a private placement in connection with the merger, with Frost and Hsiao purchasing preferred stock in the deal
>> Marlin Capital shows up as a "Safestitch investor" in SEC filing dated 9/6/13 (unclear how large)
(4) Frost, Honig and Brauser all own shares and Brauser's son is an executive
(5) GRQ Consultants Inc 401(k) offered 1.2mm shares in an August 2011 offering -- Barry Honig had "voting and investment power over securities owned by the selling securityholder, as its trustee"
>> Michael Brauser owned 301,152 shares that he sold in the offering
(6) Per prospectus dated 11/1/13 (PF for transaction); Frost, Honig (including GRQ) and Brauser all own shares; all sold stock in the offering
(7) EXCX becomes SAGE which becomes Pershing Gold (PGLC) -- Honig on the board; was chairman of Sagebrush Gold
(8) MusclePharm, Brauser, Honig and Frost Gamma were part of a $700,000 investment in November 2013 into Fuse Science
(9) Per Schedule 14C filed November 26, 2013
>> Andrew Uribe, CEO/CFO/Secretary/Treasurer and Director of Silver Horn Mining is was "the sole officer and director of Marathon Patent Group" (MARA) 12/29/11 - 1/26/12
>> Per Diamond's 13G filed on 7/23/10, SILV used to be Eclipse Mediatechnologies (ticker EEMT)
(10) Marlin Capital filed 13D on 10/5/11 owning 5.5% of the company (both Honig and Brauser signed filing)
(11) 12/3/12 -- ChromaDex (CDXC) acquired Spherix Consulting, a subsidiary of Spherix
(12) 5/19/2008 -- Wi-Tron and Cellvine (private Israeli co) signed merger agreement -- Cellvine is "an Israeli company with investors including ... US entrepreneur Dr. Phillip Frost"
(13) Honig holdings include direct holdings of Barry Honig plus GRQ Consultants

*Source: Bloomberg, SEC filings*

59.     The Report then detailed examples of litigation against and suspected fraud by Honig and Brauser. For example, in March 2009, Honig and Brauser were sued for violating federal securities laws in a suit that included detailed allegations that "Defendant Michael Brauser had been 'intimately involved in carrying out various frauds . . . and covering up their misdeeds through threats and intimidation.'" In another suit, "Defendant Michael Brauser [wa]s accused of knowingly withholding payroll taxes from employees without remitting them to the government, filing materially false and misleading financial reports, and intentionally making misrepresentations of material facts."

60.     Notably, the Lakewood Report specifically highlighted Frost's and Opko's investments alongside Honig and Brauser in BioZone, stating that:

> *Opko itself is involved with the penny stock trio through its ownership of 10.9% of Biozone Pharmaceuticals (BZNE). Currently, Frost owns 14.5% of the company, Honig owns 7.9% and Brauser owns 6.8%.* Here are some facts about BioZone:
>
> …
>
> - *Since Opko announced its investment in BioZone in February 2012, the stock is down ~80%; and*
> - The Frost Group, Honig, and Brauser were all . . . subject to a lawsuit by the original founder of the company. . . .
>
> Also, an investor would be forgiven for wondering why, in August 2013, BioZone sold convertible notes and warrants to MusclePharm, a company backed by Honig (including his company, GRQ Consultants) that lists Frost as a member of its "Scientific Advisory Board" (with MusclePharm leasing office space in Frost's building). And then just last month it was announced that BioZone is going to sell "substantially all of [its] operating assets" to MusclePharm. BioZone subsequently announced that it will merge with Cocrystal Discovery (a private company in which Opko and Frost are investors).
>
> Opko is also involved with yet another investment with "the trio," ChromaDex (CDXC). Opko made a $1 million investment in CDXC in February 2012 for a 1.5% ownership stake of the company. Once again, Opko is a shareholder alongside Frost (14.6% of the company), Honig (7.6% of the company) and Brauser (7.98% of the company). This time, Honig and Brauser are co-Chairmen of the company.

61.     The Lakewood Report included a chart showing Frost's and Opko's business relationships with Honig, Brauser, and a number of other related companies and individuals:



62.     In addition to Frost's investment history with and connections to Honig, Brauser, and their other associates, the Lakewood Report also stated that Frost had been purchasing large quantities of Opko stock in order to artificially buoy the share price:

> Dr. Frost has consistently purchased Opko shares in the open market and many investors seem to be buying the stock at any price based on this fact alone. The logic seems to go, *"if Phil is buying, surely he must know something."* Investors have been trained to follow insider buying, and we believe ***Dr. Frost has likely taken advantage of that fact to draw in unsuspecting retail buyers who don't fully understand what they own.*** We imagine Dr. Frost at this point realizes he is effectively "pot committed" in Opko, and if he stops buying shares in the open market, confidence would likely disappear and the stock could plummet (his stake

25

is also worth an astonishing $1.9 billion, which is a lot for anyone to fight hard to hold on to… not to mention what must be a keen interest in maintaining the support and trust of his followers). . . .

If Dr. Frost is buying the shares out of a genuine belief the shares are undervalued then why buy a little bit every day as opposed to all at once? Also, why would he go to such lengths to bolster the price through numerous television appearances and overly optimistic statements if he is trying to buy the stock for financial gain?

63.     As a result of the issues described in its Report, Lakewood stated that Opko shares could be "worth 75% to 100% less than where they are currently trading." Lakewood concluded:

> ***We believe Opko shares offer little in the way of substance and a great deal in the way of illusion. We believe Opko shareholders have unknowingly been fed a placebo, a mere sugar pill of insider share purchases, overhyped opportunities and bullish analyst forecasts.*** The problem, of course, with a placebo is generally one of confidence. As long as people believe in the efficacy of a placebo, it has remarkable powers, but once people realize this supposed wonder drug is just a simple sugar pill, its powers can suddenly disappear.

### C.     As Opko Shares Declined In Response to These Concerns, Frost and Opko Made Repeated False Denials and Reassuring Statements

64.     In the days after Lakewood questioned the legitimacy of Frost's and Opko's investment activities, the Company's stock price declined on high trading volume, falling from approximately $11.50 per share to $9.09 per share between December 10 and December 16, 2013.

65.     On December 17, 2013, Investorplace.com published an article titled "OPK—With Opko Health Hammered, Should You Run or Buy?," which asked:

What in the world is going on at Opko Health (OPK)? . . .

OPK stock was sailing for most of 2013, as biotechs and other health care stocks were all booming . . . . OPK stock climbed from $5 at the start of the year to a closing high of $11.63 on Dec. 9.

But suddenly the bottom dropped out. . . . ***Opko Health slid 26% lower in just a few days, currently going for under $9***.

While this is not uncommon for a speculative biotech stock, it was not a poor earnings report, FDA rejection, nor an analyst downgrade that caused the swoon. Instead, ***OPK stock got hammered by a brutally negative article entitled "Opko Health: The Placebo Effect."*** . . .

> ***Immediately after the 45-page report was published, investors fled OPK stock in
> droves.*** . . .

66.    To stem the decline in Opko's stock price, Frost and Opko went on a sustained

public-relations offensive, repeatedly and strongly denying any wrongdoing or that the Lakewood

Report had any basis in fact. At the same time, Frost purchased additional Opko stock, looking to

reassure investors that the negative reaction to the information Lakewood reported was unfounded.

67.    On December 13, 2013, Opko issued a press release flatly denying the content of

the Lakewood Report, assuring investors that the Company was pursuing a legitimate business

strategy, and stating that it would further update investors at a December 17 conference:

> We are aware of the report, which we believe is ***based on distorted and inaccurate
> information***. We continue to believe in our ***unique business strategy and in the
> importance of OPKO's therapeutic and diagnostic product candidates***. We are
> fully committed to developing and commercializing our products and we look
> forward to updating investors in a timely manner.

68.    Frost also participated in a Q&A interview with "TheStreetSweeper," which was

published on Seeking Alpha on December 16, 2013, and entitled "***Opko Health: Standing Bullish***

***Following Q&A With Dr. Phillip Frost***." In response to the Lakewood Report, Frost again

reassured investors that Opko's investing activities were all legitimate:

> I can't keep people from being influenced one way or another. ***All I know is I invest
> because I don't know of another investment I could make that I would be more
> comfortable with.*** It's not part of a marketing strategy. Because if I didn't believe
> in it I would be throwing away an awful lot of money. I'm not the type of person
> who throws away money.

69.    The day after the StreetSweeper article was published, December 17, 2013, Opko

held an investor conference in which it again reassured investors following the Lakewood Report.

At the conference, Frost described Opko's investments as legitimate, telling investors that Opko's

investment "strategy is straightforward, though a bit unique. . . . We want to invest in small

companies with novel technologies as investments for appreciation as well as for product rights."

Frost further told investors that he had "never been associated with a company that presents so much opportunity."

70.     Thereafter and throughout the Class Period, Frost and Opko made a number of other statements designed to reassure investors that their investment activities, including the investments in BioZone and MabVax, were legitimate, were based on the identification of valuable proprietary technology, and were made to benefit Opko and its shareholders.

71.     For example, in the Company's Class Period Form 10-Ks, Opko stated that its management team, led by Frost, "has significant experience in identifying [and] executing" Opko's investments, and that

> We expect to use well-timed, carefully selected . . . licenses and investments to continue to drive our growth, including . . .
>
> Early stage investments. **_We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder_**.

72.     Likewise, several investor presentations by Opko during the Class Period pointed to Opko's investments as a key part of the Company's business that would create value for the Company and the investors in its common stock. For example, in a presentation during a December 10, 2013 Oppenheimer Healthcare Conference, the Company identified its "Opportunistic Investments" in "Innovative Technologies" as a driver of 'its "High Growth," as well as "Strategic Investments" in "Proprietary Technologies with Significant Upside Potential."

73.     Notably, that list of "Proprietary Technologies with Significant Upside Potential" included Opko's "~11% equity interest" in BioZone. A substantially similar list of "Strategic Investments" in a June 4, 2015 investor presentation by Opko included BioZone's successor entity Cocrystal Pharma, Inc. ("Cocrystal"), and also highlighted Opko's "~7% equity interest" in

MabVax. The same or similar statements appeared in several other investor presentations by Opko during the Class Period. *See* Section VIII below.

74.     Frost and his associates also paid for and caused multiple promotional articles and press releases that highlighted Frost's and Opko's supposedly legitimate and promising investments in BioZone and MabVax to be written and disseminated to investors. For example, as detailed further below, Frost and his associates caused an article to be published on Seeking Alpha entitled "Opko And Its Billionaire CEO Invested In Biozone," touting Frost's and Opko's investments in BioZone and BioZone's development of an injectable drug-delivery device. Likewise, they caused articles to be published on Seeking Alpha on April 8, 2015 (entitled "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics") and July 1, 2015 (stating that "Frost and Opko just invested in MabVax and given Dr. Frost's track record, MabVax could be another home run trade"). These articles showcased Frost's and Opko's investments in MabVax (and other companies) as a purported path to "meaningful value creation for Opko shareholders."

**D.     Unbeknownst to Investors, Lakewood Was Correct, and Frost's and Opko's Investments in BioZone and MabVax Were Made to Facilitate Illicit Pump-and-Dump Schemes**

75.     Unbeknownst to the investing public, while making the statements noted above, Frost and his associates were involved in multiple "pump-and-dump" schemes, including with respect to their investments in BioZone and MabVax.

76.     Pump-and-dump schemes, by their nature, are fraudulent schemes designed to artificially inflate (or "pump") the price of a company's securities so that insiders who purchased shares at a low price can then sell (or "dump") their shares into an inflated market, realizing ill-gotten profits. Typically, the pump-and-dump perpetrators purchase stock (either a controlling stake or, if not, a large position in the aggregate) of a company with a small market capitalization, and they acquire the stock at a very low cost. After acquiring their positions in the company, the

perpetrators then foment investor interest through various illicit practices, including making false and misleading positive statements about the issuer and engaging in coordinated trading to boost volume. The false promotional statements about the company are frequently made or paid for by conspirators who stand to benefit from the scheme, but those interests are not disclosed. By targeting small companies that are thinly traded, the scheme participants can attract investor interest with false and misleading statements and trading volume, since there is little to no trading volume or available information otherwise.

77.     Once the stock price has been "pumped" by the false promotional statements and coordinated trading activity, the perpetrators then sell their shares for a significant gain, frequently over a period of weeks or a few months in order to conceal the coordinated nature of the fraudulent activity. Once the perpetrators have "dumped" their shares, and in the absence of continued false promotional activity, the company's stock price comes back down, leaving public investors who purchased at artificially inflated prices with substantial losses.

78.     Pump-and-dump perpetrators frequently take actions to conceal that they worked in concert with each other, including concealing or otherwise failing to report that they acted together to amass a large position in the issuing company's stock.

79.     Frost's participation was critical to the success of the pump-and-dump schemes described in this complaint. Frost's reputation as the "Warren Buffett of biotech" attracted widespread retail-investor interest in Opko, as well as the companies that Frost caused Opko to invest in. Frost's retail-investor following provided the market interest necessary to drive up prices in the companies that Frost and his associates targeted.

80.     As the SEC stated in its First Amended Complaint charging Defendant Frost with violating the federal securities laws based on the facts alleged in this complaint, Frost "enjoys a

reputation as a successful biopharmaceutical investor and has a substantial following among retail

investors," and "Brauser understood . . . that [Frost] brought his retail investor following and

reputation as a successful investor to provide liquidity when the participants wished to sell." As

the SEC explained:

> [Frost] invested alongside Honig (or a Honig entity) in several issuers from 2011.
> For Honig and his co-investors, ***[Frost]'s participation in a deal brought an aura***
> ***of legitimacy, important publicity for the issuer, and—most helpful in creating***
> ***market interest in the particular issuer—his substantial following among retail***
> ***investors***. As a consequence, Honig and Brauser frequently sought to persuade
> [Frost] to invest alongside them. As Stetson put it in a 2015 email to the CEO of
> [MabVax], the ***"following of [Frost] is worth its weight and [sic] gold."***

81.    Precisely for this reason, the fraudulent articles that Defendants commissioned and

authorized highlighted Frost's decision to invest in MabVax and BioZone. This point of emphasis

attracted retail investors to the "pumped" companies, just as it had attracted them to Opko—and

left them holding the bag when the companies imploded. The fraudulent schemes to pump and

dump MabVax and BioZone would not have succeeded—at least to the extent they did—had it not

been for the focus on Frost as a key selling point to create and bolster investor confidence.

**1.    Frost, Opko, and Others Engage in the BioZone Pump and**
**Dump**

**a.    Frost, Opko and Others Acquire Large Stakes in BioZone**

82.    Beginning before the Class Period, Defendants Frost and Opko, and others,

engaged in a scheme to "pump and dump" the stock of pharmaceutical company BioZone (the

"BioZone Pump and Dump").

83.    The BioZone Pump and Dump originated in November 2010, when Honig and his

associates Stetson and Groussman together purchased one-third of a publicly traded shell

company, International Surf Resorts, Inc. ("ISRI"). Shortly thereafter, in December 2010,

Defendant Frost and Brauser each purchased one-half of the remaining two-thirds of ISRI. When

Frost, Brauser, Honig, Stetson, and Groussman acquired their stakes in ISRI, they did so by purchasing their shares from an intermediary, enabling them to conceal their involvement in ISRI and its subsequent business. They then installed Roberto Prego-Novo, an associate of Frost who had previously worked with Frost at Ivax, Teva, and Aero Pharmaceuticals, Inc. ("Aero"), as ISRI's sole director.

84.     At the time, BioZone was developing a drug-delivery technology known as "QuSomes" that purportedly allows skin-care and other products to penetrate the skin more effectively.

85.     After acquiring ISRI, Frost and his associates approached BioZone's management, including at least BioZone's CEO, Daniel Fisher, and its Chief Scientific Officer, Brian Keller, in late 2010 to propose a reverse merger in which the then-privately held BioZone would become public by combining into the publicly traded shell, ISRI.

86.     Reverse mergers have long been considered a suspect method of taking a company public. The SEC and FINRA, among others, have noted that reverse mergers may allow companies to access the public markets without the level of scrutiny or transparency that would otherwise help guard against fraud and abuse. For example, in a 2011 speech, SEC Commissioner Luis A. Aguilar explained:

> A common but lesser known way of accessing the public markets is the reverse merger into a public shell, or where a public shell merges into a private company, *a so-called "backdoor registration."* For those of you not familiar with these types of mergers, what typically happens is a private company seeking to go public merges with a public shell company. Before the transaction, the public shell company no longer has substantive operations, but its public company registration remains in effect. *The [reverse merger] transaction gives the formerly private company the credibility and access to capital of being registered as a public company, without any of the vetting from underwriters and investors that companies undergo when they perform a traditional IPO.*

87.     BioZone management believed that the reverse merger with ISRI would allow BioZone to access capital to fund research and development, including of its QuSomes technology. Indeed, Frost, Honig, and Brauser told Fisher that they would raise between $8 million and $15 million for QuSomes-related research and development and would provide then-CEO Fisher with 6.65 million shares of the public company that would be formed by the reverse merger.

88.     In January 2011, BioZone and The Frost Group, a private-equity group including Frost, Brauser, and Honig, sent BioZone a binding letter of intent that memorialized The Frost Group's intent to invest in BioZone, including to provide funding for BioZone's research and development of drug-delivery technology. The letter of intent was sent on letterhead from the "Honig, Brauser, Frost Group." BioZone management countersigned the letter of intent on February 1, 2011.

89.     During February 2011, Keller organized multiple meetings in Miami—in the conference room outside Frosts's own office—with Frost, Keller, BioZone patent attorney Lee Pederson, and Honig, as well as Elliot Maza and Roberto Prego-Novo (who as discussed below were later installed in key leadership positions at BioZone).

90.     Pederson has since detailed these meetings and other key facts in a lawsuit against Frost, Opko, BioZone's successor entity, and others. Pederson is an attorney who has worked in research and development since about 1985 and met BioZone's founders, Keller and Fisher, in about 1999. Pederson did legal work for BioZone from 1999 until June 2012 and was personally involved in meetings and other communications with Frost, Honig, Maza, and their associates from 2011, when Frost and his associates first negotiated their investments in BioZone and took control of the company, until June 2012.

91.     According to statements in a lawsuit that Fisher later filed against Frost and others, at one of those February 2011 meetings in Miami, Frost "insisted" that BioZone use Elliot Maza as its lawyer in connection with the proposed merger between ISRI and BioZone.

92.     On February 28, 2011, BioZone and ISRI entered into a securities purchase agreement under which the reverse merger would take place. The agreement included a notice address for both Aero (a company owned by Frost and his associates that BioZone was to acquire after merging with ISRI) and BioZone of 4400 Biscayne Boulevard—the same business address for Opko, Frost, Honig, and several other Frost- and Honig-related entities, including FGIT.

93.     Frost received significant personal benefits as a direct result of the ISRI-BioZone merger. Contemporaneous with that deal, Frost, Honig, and Brauser had ISRI purchase certain unprofitable assets that Frost held. Specifically, on May 16, 2011, BioZone, through a subsidiary, acquired Aero in exchange for more than 8.3 million shares of BioZone common stock. According to a Form 10-K/A filed by BioZone on September 12, 2013, Frost (through FGIT) owned 46% of Aero's outstanding stock, and an additional 23% was owned by Prego-Novo, Frost's former employee at both Teva and Ivax. Frost, Honig, and others had hand-picked Prego-Novo to serve as a BioZone director (and he became BioZone's Chairman on June 30, 2011). As that Form 10-K/A disclosed, after BioZone acquired Aero, "[e]ach of Dr. Frost and Mr. Prego-Novo benefically owned approximately 10.63% and 4.62%, respectively" of BioZone, which came at a de minimis cost, as "Dr. Frost acquired a portion of his shares in February and March, 2011 for approximately $0.027 per share, while the remainder of his shares were acquired through the cashless exercise of warrants." In this manner, Frost acquired additional BioZone shares extremely cheaply.

94.     In March 2011, after ISRI and BioZone agreed to the reverse merger, the BioZone Pump and Dump encountered an obstacle. A bank that had veto power over major transactions by

BioZone by virtue of a $3 million line of credit refused to approve the ISRI-BioZone transaction. Among other things, the bank stated its concerns that "[t]he proposed acquisition creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of [the investor group] as a whole, rather than the interests of [BioZone]." However, Frost and his associates pushed the merger forward anyway, and it closed in June 2011, causing the bank to send a default notice.

95.     In addition to installing Prego-Novo as BioZone's Chairman, Frost, Honig, and their associates also placed at the company's helm Elliot Maza, who was named BioZone's Interim CEO, CFO, and Secretary on May 16, 2011, and was then named to serve as the CEO permanently on August 2, 2011. On September 8, 2011, under instructions from Maza, who had just been installed at BioZone, BioZone paid off the bank line of credit. By paying off the loan, Maza removed the bank as an obstacle to BioZone's merger with ISRI. To finance the payment, however, BioZone took on substantial loans from Frost in the form of short-term convertible debt at high interest rates.

96.     As the SEC has stated, "[a]s a result of the reverse merger, Honig, Brauser and [Frost] controlled the vast majority of [BioZone]'s outstanding shares," and "[t]hereafter, Maza sought approval from Honig, Brauser, and sometimes [Frost] for material business decisions." Those decisions included "agree[ing] to divert funds from [BioZone] to pay rent for the office of an unrelated entity . . . also located at 4400 Biscayne Boulevard," i.e., the location of Opko's offices, owned by Frost through Frost Real Estate, where FGIT, Honig, and other Frost- and Honig-related entities have offices.

97.     Indeed, according to the SEC, "Maza . . . sent Honig, Brauser and [Frost] updates at least every month providing details on business operations and business opportunities, as well

as seeking their approval for material business decisions." For example, on February 28, 2013, Maza sent an email to Brauser and Honig reporting that Honig and Frost had approved of proposals from two lenders, and seeking Brauser's agreement as well, asking "[Frost] is OK if you're OK with it. Work for u?"

98.    In December 2011, Fisher filed a whistleblower complaint with the SEC stating that Frost, Honig, Brauser, and related entities and individuals had committed securities-law violations and had breached their stock-purchase agreement in connection with the merger, under which Fisher was due to receive over 6.6 million BioZone shares. In January 2012, Maza fired Fisher from BioZone and, on November 22, 2012, Fisher sued BioZone, Frost, Honig, Brauser, Maza, and others, alleging, among other things, fraud, securities-law violations, RICO violations, and Dodd-Frank violations. *See Fisher v. BioZone Pharm., Inc.*, 2013 WL 12144120, at *1-2 (N.D. Cal. Feb. 12, 2013) (order denying motion to dismiss). The parties to that suit ultimately agreed to a settlement, effective September 5, 2013, that paid $2 million to Fisher.

99.    Despite the promises made by Frost and others at the time of the ISRI-BioZone merger, Frost and his associates did not actually invest funds for research and development at BioZone, but instead provided a minimal level of capital through a series of PIPE financings between February 24, 2012 and March 12, 2012 in exchange for warrants for additional BioZone shares. Those funds primarily went to pay outsized compensation to Maza and Keller. According to BioZone's public filings, Maza's compensation went from $288,462 in 2011 to $573,694 in 2012 and $371,868 in 2013, while Keller's went from $135,712 in 2011 to $198,961 in 2012 and $310,135 in 2013. At the same time, BioZone's research and development foundered, and BioZone ceased its research-and-development activities by mid-2012.

100.    On August 30, 2013, in a Form 8-K filed with the SEC, BioZone disclosed that it had entered into a securities-purchase agreement with the MusclePharm Corporation ("MusclePharm"), in which Frost was a large investor. Under that agreement, MusclePharm invested $2 million in BioZone in exchange for a 10% secured note convertible into shares of BioZone common stock for $0.20 per share. MusclePharm also received a 10-year warrant to purchase 10 million BioZone shares for $0.40 per share.

101.    Notably, Harvey Kesner, an attorney who had represented Frost in a number of matters, represented MusclePharm in its deal with BioZone. The SEC has stated that Kesner and his firm were retained at Honig's insistence by BioZone, MabVax, and other issuers in which Honig invested. As *Barron's* reported in an October 4, 2018 article titled "The Lawyer at the Center of the SEC Pump-and-Dump Case," during the past decade, Kesner has represented nearly two dozen public companies backed by Honig or other defendants in the SEC action against Frost, Honig, and others. Kesner resigned from his law firm shortly before the SEC filed its action, and MabVax sued him and his firm for malpractice, stating that the lawyers served the interests of Honig and his associates to MabVax's detriment, including by concealing the relationship between Frost and Honig through Southern Biotech.

102.    While they were acquiring outsized interest in, and controlling, BioZone, Defendants concealed that they and Frost's associates were acting as a coordinated control group of BioZone. As background, the federal securities laws require that persons or groups who acquire large amounts of a company's stock and are in a position to exert control over the company make filings disclosing that ownership stake and control to public investors. Among other legal requirements, a person who acquires beneficial ownership of more than 5% of a voting class of a company's equity securities is required to file a Schedule 13D beneficial-ownership statement with

the SEC. If a group collectively acquires more than 5% of an issuer's stock, each member of that group must file a Schedule 13D, even if no single investor's stake is more than 5% of the company's stock. Those requirements protect public investors by ensuring transparency about who controls the company in which they are investing, including by alerting investors to a control person or control group that may cause or influence the company to act in a way that is beneficial to the controller but not necessarily to the company or its public investors.

103.   By April 1, 2013, Frost, Opko, FGIT, The Frost Group, Honig, and Brauser, along with co-investors including Maza, Keller, Stetson, and Prego-Novo, together held nearly 45 million BioZone shares, representing approximately 71% of outstanding BioZone stock. Included in those shares were 2,250,000 shares that Frost obtained by converting a June 2012 convertible promissory note, as well as a $500,000, 10% unsecured convertible promissory note.

104.   Consequently, the securities laws required these individuals to disclose that they were operating as a control group.

105.   However, neither BioZone, Frost, Opko, or any of Frost's associates publicly disclosed, including in any filings with the SEC, that group's control of BioZone.

106.   If the control group had properly and truthfully been disclosed, public investors would have known that Frost, Honig, and their associates were acting in concert to exercise control over BioZone, and that the trading the group later engaged in to create the appearance of market interest in BioZone was part of a coordinated effort to pump up the price of BioZone stock for the group's own benefit to Opko's detriment.

### b.   Frost, Opko, and Others Pump and Dump BioZone Stock

107.   In September 2013, Frost, Honig, and their associates, whose coordinated control of BioZone was not publicly known, were prepared to improperly reap significant sums based on their investments in BioZone at the expense of public investors. At the time, Frost, Honig, and the

others were unable to monetize their collective 71% ownership stake in BioZone, as the company's stock had little-to-no trading volume; as the SEC has described it, "the market for [BioZone] was virtually nonexistent (with zero volume on September 20, 2013)."

108.    In September 2013, Honig contacted O'Rourke, who has shared office space with Honig and (until the SEC Complaint) served as CEO of Riot Blockchain, a company whose largest shareholder at the time of the Biozone Pump and Dump was Honig.

109.    Honig instructed O'Rourke to contact Ford, a stock promoter who regularly published articles on the Seeking Alpha website, and to offer Ford below-market-price BioZone shares in exchange for publishing a Seeking Alpha article promoting BioZone. Such an article could boost investor interest in BioZone and drive up BioZone's trading volume and share price. And, as O'Rourke instructed Ford, talking up the involvement of Frost—the "Buffett of biotech"— was central to pumping up BioZone. Ford agreed.

110.    Beginning on September 23, Honig and others executed numerous BioZone trades to falsely create the appearance of investor interest in BioZone. Those trades included the below-market sales to Ford. Specifically, at O'Rourke's direction, Ford and Honig engaged in a coordinated trade of 180,000 BioZone shares on September 23 at $0.40 per share, significantly below the price at which BioZone stock was otherwise trading that day. In total, after zero trading volume on September 20, 302,000 BioZone shares were traded on September 23. Those trades included purchases by O'Rourke from another Honig associate at 3:58 p.m., just before the close of trading, at $0.68 per share. Those trades, which were at a substantially higher price than the $0.55 per share at which BioZone had traded just before the trades, created the false appearance of an upward trend in BioZone's share price, known as "marking the close."

111.     On September 26, 2013, the first day of the Class Period, at 3:36 p.m. (just before the close of trading for the day), Ford's fraudulent BioZone article was published on Seeking Alpha, which as promised highlighted Frost's and Opko's investments in BioZone in order to drive investor interest in BioZone stock. The article, titled "***Opko And Its Billionaire CEO Invested In Biozone***," stated:

> I recently established a position in BioZone Pharmaceuticals based on the company's undervaluation, its patented QuSomes technology, and the fact that ***Opko and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.)*** BioZone's strong patent portfolio, multibillion-dollar addressable markets, and current revenue stream, make it an ideal asymmetrical trade, with large upside potential, and limited downside risk.

112.     The article included a question-and-answer interview with Keller, which Ford stated was "the best way to understand BioZone's technology and business model." In that discussion, Keller touted the further development of BioZone's QuSomes technology as a growth driver for BioZone. He expressly pointed to Frost as part of BioZone's growth plan. In response to Ford's question "What's your plan in terms of when to take on a partner?," Keller stated, "Once we are ready to market the product, we will consider marketing and distribution partners. ***It will certainly be something we discuss with Dr. Frost***."

113.     In a "summary of this interview," the article stated:

> Here are some key points: . . .

> Dr. Phillip Frost and his company, Opko, have purchased 17.68 million shares of BioZone stock (about 25% of the company). In my opinion they would not have taken such a large position unless BioZone's QuSomes technology was solid. I feel confident in my due diligence, but ***Dr. Frost and his scientific team are capable of a much higher level of scientific analysis than I could ever conduct. His large position in BioZone is a strong validation of the company's technology***. . . .

> ***With Opko and Dr. Frost's investment in the company, I assume Dr. Frost is offering his experience and expertise in guiding the company's development.*** Given his track record, this can only benefit shareholders and is ***one of the primary reasons I invested in BioZone***.

114.    The article also discussed a February 2012 licensing agreement between BioZone and Opko, stating that positive trial results for any Opko drugs using BioZone's QuSomes technology "would be good for BioZone **and Opko shareholders**."

115.    In addition, in the discussion between Ford and Keller, Ford asked about "any other product candidates" in BioZone's pipeline. Keller responded by pointing to BioZone's purported development of an injectable version of an antifungal drug, Posaconazole, which he stated would enable BioZone to "capture a large percentage of the $4 billion injectable antifungal market." When Ford asked, "What makes you think you can develop an injectable version of Posaconazole?," Keller answered, "*We have already developed a formulation*."

116.    The September 26 Seeking Alpha article failed to disclose that Ford had been compensated to write the article in the form of the below-market-price BioZone shares. Rather than properly disclosing those facts, which would have revealed Ford's bias and called into question the article's reliability, including concerning Frost's and Opko's reasons for investing in BioZone, Ford represented that "I am long BioZone. I wrote this article myself, and it expresses my own opinions. *I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.*"

117.    The article touting BioZone boosted both trading volume and BioZone's stock price, as intended. Specifically, BioZone trading volume increased from 1,149 shares on September 25, 2013, before the article's publication, to 128,921 shares on September 26, 2013, to 4,500,346 shares on September 27, 2013, reaching a volume of 6,061,744 million shares on October 2, 2013. And BioZone's share price rose dramatically in response to the article, from an average of approximately $0.48 in August 2013 to a close of $0.50 on September 25, 2013, rising to $0.68 on September 26, 2013, and reaching an intraday price of $0.97 on October 17, 2013.

118.     Frost, Honig, and their associates profited handsomely—to Opko's detriment—from the investor interest in BioZone that Ford's article generated. After the "pump" came the "dump"—including Frost's sales of 1,987,991 BioZone shares between October 1 and 4, 2013, for proceeds of $1,085,321.74. Collectively, between September 23, 2013 and December 27, 2013, Frost, Honig, Brauser, Groussman, Stetson, O'Rourke, and affiliated entities and individuals (not including Opko) sold over 15.7 million BioZone shares for proceeds of nearly $9.3 million.

119.     Under SEC Rule 144, promulgated under Section 5 of the Securities Act, investors who acquire "restricted securities" in unregistered, private sales from an issuer or an issuer's affiliate (such as in a private placement), or hold "control securities" because they are affiliates of the issuer, cannot sell those securities publicly unless certain conditions are met. Without an applicable exemption, the seller is required to file a registration statement that discloses important information about the company (including, for example, information about management and company control), to ensure that public investors have accurate information about the company and can thereby make informed investment decisions. Because Opko, Frost, Honig, Brauser, Groussman, Stetson, O'Rourke, and affiliated entities and individuals were a control group, and also because certain of their shares were "restricted securities" under Rule 144, they could not legally sell their BioZone shares without effective registration statements in place.

120.     But there was no registration statement in effect for any of the BioZone stock sales by Frost, Honig, Brauser, and Groussman between September and December 2013, and no applicable exemption. Moreover, BioZone had approximately 63 million shares outstanding in September 2013, and approximately 75 million shares outstanding on November 15, 2013. Under applicable law and regulations, because BioZone shares did not trade on a national exchange, individuals and entities associated with BioZone could not legally sell more than 1% of BioZone's

total outstanding shares in any three-month period. Each of Frost, Honig, Brauser, and Groussman, including affiliated entities, exceeded that limitation on sales. For that reason, and because they made their sales without effective registration statements in place, those sales further obscured their group's control of BioZone and role in the BioZone Pump and Dump.

121. By the end of 2013, Frost's and Opko's ownership in and control over BioZone increased, in exchange for substantially below-market consideration. First, on November 13, 2013, MusclePharm, in which Frost was heavily invested, signed an asset-purchase agreement with BioZone to acquire substantially all of BioZone's assets in exchange for 1.2 million shares of MusclePharm stock that had a market value of $9.22 per share, with a total value of over $11 million—approximately a quarter of BioZone's market capitalization at the time, representing a steep discount to the company's market value. Next, on November 27, 2013, BioZone announced an agreement to merge with privately held biotechnology company Cocrystal, which had previously received strategic investments from Teva, as well as The Frost Group and Opko—who together owned approximately 40% of Cocrystal. The company's board of directors was replaced, and Frost and others were installed as directors.

122. As noted above, the September 26 Seeking Alpha article was materially false and misleading because, unbeknownst to investors, it was a paid promotional piece used to artifically pump up the price of BioZone stock. The article was also materially false and misleading because Frost and his associates reneged on Frost's promise to fund BioZone's research and development and caused the company to cease research and development in mid-2012, a year before they "dumped" its stock.

123. Former BioZone employees confirmed that Frost and his co-investors never invested the research-and-development funds into BioZone that were promised and represented to

43

investors. BioZone's former Account Management Specialist from February 2011 to November 2013 was responsible both for finding new clients for BioZone as well as maintaining relationships with existing customers. In that capacity, the former Account Management Specialist had numerous conversations with dissatisfied customers during his/her tenure at the company, many of which were ending their relationships with BioZone because the company was never on time with its products, even after the customers paid "materials deposits" at the time of their orders ostensibly to finance the contracted projects. The former Account Management Specialist explained that s/he spent a lot of time working with Keller, Maza, Fisher, and others, and that Keller and Maza stated frequently that after Frost, Honig, Brauser, and their associates invested in and became involved with BioZone, the company never had funds available to purchase raw materials.

124.  The Account Management Specialist, who left BioZone around the time that its assets were sold to MusclePharm, further explained that the "people down in Florida," meaning Frost and other Opko-related individuals, refused to provide capital to BioZone, and that after Maza was installed as BioZone's CEO, the situation at BioZone got increasingly worse. The Account Management Spcialist explained that BioZone had to stop manufacturing personal care and cosmetic items, and s/he was told that Opko was forcing the BioZone-MusclePharm transaction through even though both entities were "floundering."

125.  Moreover, a former Analytical Chemist at BioZone from both 2009-2010 and 2013-2014 who reported to BioZone's Manager of Quality Control Cris Dolor—who, in turn, reported to Keller—confirmed that BioZone was not developing an injectable version of Posaconazole. The Analytical Chemist's job responsibilities included both testing raw materials to be used in products that BioZone manufactured, as well as testing the quality of products before they were

sold to the public. When asked whether BioZone was developing an injectable form of Posaconazole, the former Analytical Chemist stated, "Never. If that place worked on anything injectable it would be deadly," particularly in light of numerous skin-care products that failed laboratory tests during his/her tenure at BioZone.

### 2. Frost, Opko, and Others Engage in the MabVax Pump and Dump

#### a. Frost, Opko, and Others Acquire Large Stakes in MabVax

126.    In early 2014, following the BioZone Pump and Dump, Frost, Honig, and their associates engaged in a similar fraudulent scheme to pump and dump MabVax (the "MabVax Pump and Dump"), again using false Seeking Alpha articles and coordinated trading to create investor interest.

127.    The MabVax Pump and Dump followed a similar pattern to the BioZone Pump and Dump. In early 2014, Honig identified a publicly traded shell company, Telik, Inc. ("Telik"), which could be used as a reverse-merger partner for MabVax, which was looking for research-and-development funding. On July 8, 2014, MabVax executed a reverse merger into a Telik subsidiary. The primary investors in this deal were Honig (through HS Contrarian Investments, LLC ("HSCI"), a company of which he owned 94%, an ownership stake that was not disclosed publicly) and a co-investor, Hudson Bay IP Opportunities Master Fund LP ("Hudson Bay").

128.    Following the reverse merger, HSCI and Hudson Bay together owned 67% of the shares of the (now publicly traded) MabVax. Hudson Bay was also given a "consent right" to block or approve certain corporate actions by MabVax, including issuing additional shares of the company, and any change of control.

129.    In March and April 2015, at Honig's direction, MabVax conducted two private-placement financings, Series D and Series E. Consistent with Honig's co-investor Hudson Bay's

consent right, MabVax's CEO deferred to Honig concerning which investors could participate in those financings. Indeed, the SEC Complaint quotes an email from the MabVax CEO to Honig writing that a potential investor "might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

130. On March 5, 2015, Honig sent an email to Frost, Stetson, and Brauser characterizing the MabVax financings as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . I will trade out of it for us." Four days later, Stetson sent an email to MabVax management explaining that Frost's participation in the Series D financing was crucial to attract investment and that the "following of [Frost] is worth its weight and [sic] gold." Ultimately, entities controlled by Frost, Honig, O'Rourke, Brauser, and other of their associates participated in the Series D financing, which closed in March 2015. The investors in the Series D financing bought out Hudson Bay's stake in MabVax, along with the consent right, at a favorable price.

131. In the Series E financing, which closed on April 6, 2015, and included warrants, Opko, FGIT, Honig, and other associated individuals and entities invested $12 million in MabVax. Opko did not communicate directly with MabVax; rather, Opko's documentation was transmitted through Brauser and Stetson. At the time, Honig made clear that Frost's and Opko's participation was again critical, as he asked Brauser not to participate in the Series E financing in order to "let some of our friends do it . . . [I]t would be best if we let [Frost and an Opko executive] take their full allocation." Honig further instructed that his and Brauser's participation in the Series E financing go through Southern Biotech, in order to conceal the extent of their participation and thereby highlight Frost's. On March 13, 2015, in a detailed list of investors and amounts for the Series D and E financings, Honig instructed that "Southern biotech will invest 3 million to

purchase [Hudson Bay's] notes—1 million each," and that Frost "is going to lead [PIPE] for 1 million at .75 cents."

132.    In Opko's second-quarter 2015 Form 10-Q, the Company reported that it had invested $2.5 million in exchange for 33,333 shares of MabVax Series E Preferred Stock, along with warrants to purchase 1,666,667 shares of MabVax common stock. Opko also was granted the right to designate two members of MabVax's board of directors, and Rubin, who per *Forbes* was Frost's "deals guy," was appointed as an advisor to MabVax.

133.    J. David Hansen, MabVax's President, Chairman, and CEO, has since stated in court filings in connection with MabVax's bankruptcy (which resulted from the MabVax Pump and Dump) that Frost and his associates deceived MabVax by acquiring control in this fashion. As Hansen stated under penalty of perjury, Frost, Honig, and their associates "acquired control of MabVax Holdings through fraudulent and deceptive means, concealing from [MabVax] the extent of their inter-relationships—both with each other, and with other collaborators." The "Consent Right allowed the Alleged Bad Actors to block, for any reason or no reason at all, financing MabVax Holdings desperately needed to continue its work." Decl. of J. David Hansen in Support of Debtors' Chap. 11 Petitions & First Day Mots., *In re MabVax Therapeutics Holdings, Inc.*, Case No. 19-BR-10603-CSS (ECF No. 10 filed Mar. 21, 2019) at ¶ 34.

### b.   Frost, Opko, and Others Pump and Dump MabVax Stock

134.    Frost's and Opko's investments in MabVax were intended to, and did, generate significant market interest in MabVax.

135.    On April 6, 2015, MabVax issued a press release that O'Rourke wrote highlighting Opko's and Frost's investments in MabVax to entice potential investors in MabVax. That press release, entitled "MabVax Therapeutics Announces Closing of Financing," began by stating that MabVax "[i]s pleased to announce that it has closed on gross proceeds of approximately $11.6

million in a private placement (the 'Private Placement') led by OPKO Health, Inc. (NYSE: OPK) and Dr. Phillip Frost, CEO and Chairman of OPKO Health." The April 6 press release then quoted Frost as stating that "***MabVax has a pipeline of dozens of novel antibody leads on its discovery platform*** from which it may select promising candidates to develop through clinical trials."

136.    In addition, the April 6 press release quoted MabVax CEO and Chairman Hansen lauding Opko's and Frost's investments, stating that "[w]e are proud to have OPKO Health and biotech investor and entrepreneur, Dr. Phillip Frost, lead the financing. Their input will be invaluable as MabVax advances its business plan."

137.    MabVax issued another press release on April 8, 2015, entitled "MabVax Therapeutics Catches Eye of Billionaire Investor Dr. Phillip Frost and OPKO Health," which stated that MabVax investors

> must feel like they're in just the right place at just the right time this week as news of billionaire Bio-Pharma Investor Dr. Phillip Frost, M.D., and his company OPKO Health (NYSE: OPK) have taken a strong interest in the clinical stage cancer immunotherapy company—a $12 million interest. Dr. Frost is the CEO and Chairman of the Board at OPKO Health, and for those familiar with the good doctor, you already know that ***he and OPKO have a strong record of investing in biopharmaceutical firms***.
>
> This week MabVax announced that it closed a private placement with both Dr. Frost and OPKO that netted the company almost $12 million in gross proceeds, and according to the San Diego-based firm, this financing will provide the funds necessary to advance its pipeline of clinical products and to pursue additional preclinical research programs in its pipeline. . . .
>
> ***Clearly the company is doing something right when it can capture the attention of investors like Dr. Frost and OPKO Health***, two entities that can certainly help the company further its efforts in bringing its treatments to the clinic.

138.    The April 8 press release quoted Frost saying, among other things, that "MabVax has a pipeline of dozens of novel antibody leads," and further stated that

> For MabVax shareholders, having Dr. Frost and OPKO on board could prove quite beneficial to the company's future success. After all the list of strategic investments in OPKO is quite impressive. ***OPKO's growth strategy includes investing in early-***

*stage companies like MabVax that have valuable proprietary technology and significant potential* to create value for the compan[y's] own shareholders. . . .

Dr. Frost and OPKO have been lauded for a number of strategic holdings that have proven successful . . . . So, now with Dr. Frost and OPKO Health's $12 million investment on board, it further solidifies that MabVax Therapeutics is heading in the right direction.

139.    On the morning of April 8, 2015, O'Rourke, his company ATG Capital LLC ("ATG"), and Melechdavid, Inc. ("Melechdavid"), a company owned by Honig and Frost associate Groussman, traded MabVax shares in order to create a false appearance of investor interest in MabVax. As the SEC has stated, that trading included at least one matched trade in which Melechdavid and ATG submitted matching buy and sell orders, at the same share price, both at 9:38 a.m. From an opening price of $3.14 per share on April 8, MabVax shares rose to $3.73 per share just before O'Rourke's Seeking Alpha article was published.

140.    On April 8, 2015, O'Rourke (using the pseudonym "Wall Street Advisors") published an article on Seeking Alpha entitled "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics." As with Ford's September 26, 2013 article concerning Opko's and Frost's investments in BioZone, this article encouraged investment in MabVax stock by focusing on Opko's and Frost's involvement and investments in MabVax. As the SEC stressed in its Complaint, this article "was designed to inspire [Frost]'s retail investor devotees to follow his lead and buy [MabVax] stock." The article also made numerous statements emphasizing that the MabVax investment was part of Opko's strategy of making legitimate investments based on valuable proprietary technology that would benefit Opko shareholders.

141.    The article stated, in relevant part:

*Opko Health has a strong track record of identifying undervalued companies in which to invest.*

*Opko most recently announced a strategic investment in MabVax Therapuetics which appears to present another such investment opportunity.*

49

MabVax has a pipeline consisting of two Phase II cancer vaccines, a novel antibody discovery platform, an existing relationship with Juno Therapeutics, and an enticing value proposition.

Opko Health (NYSEMKT: OPK) has a history of discerning overlooked assets in which to make strategic investments prior to value creation. *Opko shareholders, in turn, get exposure to not only Opko's core assets, but also to a bevy of smaller, high growth healthcare and biotech assets. Opko has proven quite adept at then being able to monetize these investments later in their growth cycle, translating to meaningful value creation for Opko shareholders. Its path from $2 per share when it first went public to its current $14.30 share price is filled with examples of such investments.* In this article, I shall take a look at Opko's most recent strategic investment in MabVax Therapeutics (OTCPK: MBVX), a cancer immunotherapy company. MabVax presents a compelling investment opportunity at its current market cap relative to its pipeline.

142.    The article then pointed specifically to Frost's investment in MabVax in order to

promote investor interest in MabVax:

**Opko's Strategic Investment in MabVax Adds a Technology Pipeline to its Portfolio**

Opko announced on Monday it was leading an investment in MabVax Therapeutics, which raised a total of $11.6 million and counted Dr. Phillip Frost, Opko's CEO and Chairman, among investors in the round. *MabVax fits the Opko mold for a strategic investment as a small market cap company advancing towards commercialization in a hot subsector within biotech*, cancer immunotherapy. . . .

143.    The article quoted Frost himself, touting antibody products that were purportedly

under development at MabVax:

Dr. Phillip Frost, CEO and Chairman of Opko, made the following comment regarding MabVax,

The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. The early data for its HuMab 5B1 antibody are encouraging and *MabVax has a pipeline of dozens of novel antibody leads on its discovery platform* from which it may select promising candidates to develop through clinical trials.

50

144.    The article went on to state that "[i]t seems MabVax presents another strong case study of Opko and Dr. Frost identifying an overlooked investment opportunity," and then highlighted "**Opko's Ability to Identify Investment Opportunities**":

> I believe there has historically been some confusion in how to properly value Opko due to its business model as a healthcare holding company of sorts. . . . ***Opko's most recent addition to its investment portfolio, MabVax Therapeutics, presents a strong risk/reward value proposition***. MabVax's current $140 million valuation appears small relative to the market potential for its progressing pipeline of technologies and relative to other comps in the market. . . .

145.    O'Rourke's April 8, 2015 MabVax article also falsely stated that "[t]he author wrote this article themselves, and it expresses their own opinions. The author is not receiving compensation for it. The author has no business relationship with any company whose stock is mentioned in this article." O'Rourke did not disclose his and ATG's coordinated trading earlier on April 8, his close involvement with Frost, Honig, and their other associates, or their concerted scheme to profit from pumping up MabVax's share price.

146.    The efforts of Frost, Honig, O'Rourke, and their associates to pump up the stock price of MabVax, through the Series D and E financings, press releases, and the article highlighting Opko's and Frost's involvement, were successful. From 8,833 shares on April 2, 2015, MabVax's trading volume rose to 667,454 shares on April 6 following the announcement of the Series E financing, and to 858,709 shares on April 9, the day following O'Rourke's article—a 9,622% increase. Over that same period, MabVax's share price went from a $1.91 closing price on April 1, 2015 to $4.30 on April 9—a 125% increase.

147.    Between April 6 and June 30, 2015, O'Rourke, Brauser, Groussman, Stetson, and HSCI, along with related entities, sold nearly 1.8 million MabVax shares, for proceeds of over $5.6 million.

148.     Throughout this time period, Frost and his associates made additional false and misleading statements and omissions in filings with the SEC in order to conceal their coordinated scheme. As noted above, under Section 13(d) of the Exchange Act, an individual or group with greater than five-percent ownership in a publicly traded company is required to notify the SEC and publicly disclose that beneficial ownership by filing a Schedule 13D with the SEC, reporting the investor's acquisition of the ownership stake and other pertinent information. Groups required to file a Schedule 13D include groups of individuals or entities who agree to act together to acquire, sell, vote or hold more than five percent of the issuer's stock. "Passive investors," who can certify that they acquired or held the securities in question for a purpose other than changing or influencing the control of the issuer, may instead file a Schedule 13G, which carries less extensive reporting requirements than Schedule 13D.

149.     On April 10, 2015, Frost and FGIT filed a Schedule 13G with the SEC that reported a 6.86% ownership stake in MabVax, and further that Frost and FGIT were merely passive investors in MabVax.

150.     As the SEC has stated, the April 10, 2015 Schedule 13G from Frost and FGIT was false and misleading because (a) Frost and FGIT were required under governing regulations to file a Schedule 13D, indicating that they sought to direct and control MabVax management; (b) Frost and FGIT did not disclose that they were working in concert with Honig, O'Rourke, Brauser, and their other associates with the intention to direct and control MabVax management; and (c) neither Opko nor Frost's investment vehicle Southern Biotech filed a Schedule 13D disclosing their membership in the same group. Frost made similar Schedule 13G filings on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018, each of which was false and misleading

because Frost did not disclose the existence of the control group and falsely claimed to be a passive investor in MabVax.

151.     At the time, none of Honig, Brauser, Groussman, HSCI, or the other related individuals and entities that invested in MabVax as part of the MabVax Pump and Dump filed Schedule 13Ds that would have disclosed the group's concerted investment in MabVax and intention to control management.

152.     The SEC has explained how Frost, Honig, and others used Southern Biotech to conceal their positions in certain companies as well as their intention and ability to control those companies. Specifically, "Honig used Southern Biotech as an entity through which he, Brauser and [Frost] could each funnel their investments in issuers, including [MabVax], thus shielding the size of their individual investments from disclosure."

153.     Indeed, as discussed below, MabVax filed for Chapter 11 bankruptcy protection in March 2019, largely as a result of harm MabVax suffered from the MabVax Pump and Dump. In support of that filing, MabVax's President, CEO, and Chairman J. David Hansen filed a declaration under penalty of perjury, stating that "[t]he most immediate consequence of the SEC investigation and the disclosures by SEC to Debtor MabVax Holdings' SEC counsel is the inability to file accurate financial statements," due to MabVax's inability to "rel[y] upon the accuracy of the beneficial ownership reporting of its stockholders, including reports filed on Schedules 13D and 13G and information provided directly by these stockholders."

154.     By June 2015, the investor interest that Frost, Honig, O'Rourke, and their other associates had manufactured in March and April 2015 had abated, and MabVax shares were trading around $2.00 per share. In an attempt to drive MabVax shares back up, Ford published another Seeking Alpha article on July 1, 2015, this one entitled "MabVax: Near-Term Catalysts

Could Push Shares From $2 To Over $5." The article again highlighted Frost's and Opko's investments in MabVax, stating that "Dr. Phillip Frost and Opko just invested in MabVax and given Dr. Frost's track record, MabVax could be another home run trade." The article further stated that "MabVax's technology has already been validated via . . . the Opko/Frost investment," and that:

> ***One of the primary reasons I've invested in MabVax is based on Dr. Phillip Frost's and Opko's (NYSEMKT: OPK) recent investment in the company.*** Dr. Frost and Opko were the lead investor in an $11.7 million deal. Undoubtedly Dr. Frost and his team of scientists conducted a high level of due diligence, which validates MabVax's technology.
>
> One of the most important questions for investors is whether or not MabVax's technology works. Given the size of Dr. Frost's and Opko investments, in my opinion that question has been answered in the affirmative. In other words, Dr. Frost and Opko would not have invested in MabVax unless they believed the science was solid. . . .
>
> ***Opko is a great company, and its involvement with MabVax will be positive for MabVax.***

155.     The article also highlighted Frost's investment in BioZone and its successor company Cocrystal, writing that "[a]nother example of Dr. Frost's success includes his investment in Cocrystal Pharma (OTC: COCP) at $0.30 per share. . . . I have done well investing in companies backed by Dr. Frost and MabVax could be one of his best performers."

156.     This tactic was again successful at pumping up MabVax's share price. MabVax's trading volume rose from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, a 251% increase. Similarly, MabVax's share price rose 17% from a closing price of $2.32 on June 30 to close at $2.71 on July 2.

157.     The July 1, 2015 article contained several false statements, including that a licensing deal for MabVax was imminent, when it was not, and that there were products in development that could substantially boost MabVax's share price in the near term, when in fact

clinical trials were only in early stages and any future value flowing from those products would not occur until well into the future. In addition, the article did not disclose that Ford had been compensated by Honig and his associates for writing it.

158.    As MabVax's CEO and Chairman has explained, Frost, Honig, and their associates forced MabVax into relationships with other participants in the MabVax Pump and Dump, including in connection with the articles by O'Rourke and Ford described in this complaint:

> Once in control of [MabVax], Alleged Bad Actors required, as a condition to their financing [MabVax], that [MabVax] hire a number of vendors who, unbeknownst to [MabVax], were collaborating with the Alleged Bad Actors on their pump and dump scheme. Critically, for example, [MabVax] was required to hire multiple investor relations vendors, at great expense to [MabVax]. *In hindsight, it appears [MabVax] was required to unknowingly finance through those vendors some fraudulently bullish "research" reports that facilitated the pump-and-dump scheme described below*. Also, critically, MabVax was compelled to retain Alleged Bad Actors' favored counsel, Harvey Kesner, Esq. ("Kesner") of Sichenzia Ross Ference LLP ("Sichenzia"), as counsel for securities reporting matters. By allegedly providing [MabVax] with false legal advice, Sichenzia/Kesner concealed that the Alleged Bad Actors were acting as an illicit control group.
>
> *The Alleged Bad Actors' intention in gaining control of MabVax was to profiteer through illegal "pump and dump" schemes with MabVax Holdings' stock, which have been publicly exposed by the SEC Action. The Alleged Bad Actors[] did so by, among other things, writing or having written fraudulent promotional articles about [MabVax] that were intended to drive up MabVax Holdings' stock price.* Then—acting pursuant to their illicit agreement to acquire, hold, vote and/or dispose of their MabVax Holdings shares in concert—the Alleged Bad Actors sold their shares of MabVax Holdings into the market.

159.    Between July 1 and December 31, 2015, O'Rourke, Brauser, Groussman, Stetson, and HSCI, along with related entities, sold more than 1.4 million MabVax shares for proceeds of over $2.7 million.

## V.    THE TRUTH IS REVEALED

160.    On September 6, 2018, Opko stock closed at $5.59 per share.

161.    On September 7, 2018, Opko stock opened at $5.54 per share and traded somewhat higher until approximately 1:57 p.m., when the SEC filed the SEC Complaint alleging a five-year-

long pump-and-dump scheme perpetrated by Frost, Opko, FGIT, and Southern Biotech, as well as associates of Frost including Honig, Brauser, Stetson, Ford, O'Rourke, and Groussman, in shares of three companies, two of which are identifiable as BioZone and MabVax. In particular, the SEC Complaint alleges that Frost, Honig, and Brauser obtained control of "Company A"—BioZone— and then pumped up its stock by causing Ford to publish a false article touting Frost's and Opko's investments, after which Frost sold $1,085,322 worth of its stock. Similarly, the SEC Complaint alleges that Honig and Stetson obtained control of "Company C"—MabVax—after which Frost, Opko, Southern Biotech, and FGIT acquired MabVax stock and warrants in two private transactions arranged by Honig; Honig caused O'Rourke to publish a false article about MabVax touting Frost's and Opko's investments; Frost's associates sold MabVax stock at artificially inflated prices; and Frost and FGIT filed a false Schedule 13G and four false Schedule 13G/As claiming to be passive investors despite actually being members of an undisclosed control group with their associates Honig, Brauser, Stetson, O'Rourke, and Groussman.

162.    Based on these facts, the SEC Complaint alleged that Opko, Frost, FGIT, and Southern Biotech (as well as Honig, Brauser, and their other associates) violated the federal securities laws. In particular, the SEC Complaint alleged that Opko violated Section 10(b) of the Exchange Act, Rules 10b-5(a) and (c), Sections 17(a)(1) and (3) of the Securities Act, Section 13(d) of the Exchange Act, and Rule 13d-1(a); that Frost and FGIT violated Section 10(b), Rule 10b-5(b), and Section 17(a)(2) of the Securities Act and aided and abetted violations of Section 10(b), Rules 10b-5(a) and (c), and Sections 17(a)(1) and (3); that Southern Biotech violated Section 10(b), Rules 10b-5(a) and (c), and Sections 17(a)(1) and (3); that Frost violated Sections 5(a) and (c) of the Securities Act; and that Frost, FGIT, and Southern Biotech violated Section 13(d) and Rule 13d-1(a).

56

163.    The SEC also issued a press release on September 7, 2018, entitled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Scheme." Among other things, the press release stated that "Miami biotech billionaire Phillip Frost allegedly participated in two of . . . three" "classic pump-and-dump schemes" and that Frost, Opko, FGIT, and Southern Biotech, as well as Honig and other associates of Frost, were charged with "violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws . . . ."

164.    Opko issued a press release on September 7, 2018, in response to the SEC Complaint, falsely asserting that the SEC Complaint "contains serious factual inaccuracies" and that "OPKO and Dr. Frost have always prided themselves on adhering to the highest standards of financial disclosure, and they are confident that once a proper investigation is completed and the facts of the case have been fully disclosed, the matter will be resolved favorably for them."

165.    In response to the revelations in the SEC Complaint and press release, Opko's stock price precipitously declined on September 7 from the prior day's close of $5.59 per share to $4.58, a loss of $1.01 per share or 18% in less than one hour, on exceptionally high daily volume of 17.7 million shares. At approximately 2:35 p.m., Nasdaq halted trading in Opko stock.

166.    The SEC's charges against Frost, Opko, and Frost's associates were widely reported in the news media, including Dow Jones, *Forbes*, the *Miami Herald*, and the *South Florida* Business Journal, on September 7, 2018. Market commentators' reaction was immediate and harsh. For example, Keith Speights wrote on fool.com, a widely read investment website, on September 7, 2018, that "[i]nvestors can probably expect a dark cloud to hang over Opko Health for a while" and that "Opko is a stock to avoid until more facts are known."

167.    On September 10, 2018, while trading in Opko stock was still halted, Barron's published an article titled "SEC Charges Against Phillip Frost Might Just Be the Tip of the

Iceberg." Among other things, this article reported that "Frost, Honig and . . . Brauser have appeared as investors in more than a dozen penny stocks over the last decade. Most collapsed, after impressive runs . . . ."

168.    Hindenburg Investment Research wrote an article on Seeking Alpha, another widely read investment website, on September 11, 2018, stating among other things that the Company's denial was "rather impotent" and failed to identify "a single factual inaccuracy" in the SEC Complaint, that the SEC's allegations were "blistering," and that Frost was "Opko's key leader, key lender, and its largest holder with over 30% of the equity, leaving the company in a perilous position."

169.    On September 11, 2018, Opko issued a press release about the halt in trading of its stock by Nasdaq. This press release repeated the Company's false denial of the SEC's charges: "Opko is confident that once a proper investigation is completed and the facts of the case have been fully disclosed, the matter will be resolved favorably for the company."

170.    On September 13, 2018, Todd Campbell wrote on fool.com that:

> Frost has been considered one of the savviest healthcare entrepreneurs on the planet. . . . Up until now, the fact that Frost has been involved so heavily in Opko Health as CEO and is its largest shareholder has helped support the company's share price. Given the black eye associated with the SEC charges against him, investors are unlikely to pay a Frost-premium to own Opko Health shares from here.

171.    Trading in Opko stock resumed on September 14, 2018 at approximately 1:15 p.m.; the stock opened at $3.96 per share (down from the prior trading day's close of $4.58) and closed at $3.90 on that day, down 15% from the prior close, on exceptionally high volume of 28.4 million shares. The market continued to react harshly to the facts revealed by the SEC Complaint. For example, Keith Speights wrote on fool.com that "Opko shares resumed trading today, which prompted a further sell-off in the wake of the scandal," and that "[t]he SEC's allegations are really

serious . . . . When highly public scandals involving top executives emerge, it is a legitimate reason for investors to decide to bail out on a stock. It's even worse when the company itself is charged . . . ."

### VI.   FROST AND OPKO CONSENT TO PENALTIES AND TO EXTRAORDINARY PROPHYLACTIC MEASURES TO PROTECT OPKO FROM FUTURE PENNY-STOCK FRAUDS BY FROST

172.   On September 20, 2018, Frost stepped down as chairman of Ladenburg Thalmann Financial Services, a Miami-headquartered brokerage firm.

173.   Ford settled with the SEC on September 21, 2018, agreeing to pay disgorgement of ill-gotten gains and a civil penalty in an amount to be determined, and to be permanently enjoined from participating in penny-stock offerings.

174.   On December 27, 2018, Opko, Frost, and FGIT settled with the SEC, entering into consent judgments.

175.   In Frost's consent judgment, Frost agreed to pay disgorgement of $433,181, representing his profits from the scheme, $90,206 of interest, and a civil penalty of $5,000,000. Notably, Frost also agreed to be permanently enjoined from participating in any offering of a "penny stock" (i.e., generally any equity security that has a price of less than $5.00, as provided in SEC Rule 3a51-1), with limited exceptions, thus agreeing to be barred from participating in the small-cap market that he had touted as a key area of his expertise. Frost's agreement to pay a penalty more than ten times greater than his profits from the scheme and to be permanently barred from the "penny stock" market in which he had been a frequent investor for many years demonstrates the severity of his misconduct.

176.   Frost also agreed to be enjoined from violating numerous provisions of the federal securities laws, including to be permanently enjoined from violating Section 17(a)(2) by making materially untrue statements or omissions in connection with sales of securities, to be permanently

enjoined from violating Section 13(d) and Rule 13d-1(a) by failing to file required stock-ownership reports on Schedule 13D, and to be permanently enjoined from violating Sections 5(a) and (c) by selling unregistered securities.

177.   In Opko's consent judgment, Opko agreed to retain an independent consultant acceptable to the SEC to review, among other things, the Company's compliance with Section 13(d) in relation to investments made at the suggestion of and in tandem with Frost. Significantly, Opko also agreed to establish a Management Investment Committee to make recommendations to an Independent Investment Committee of the Board of Directors "to handle existing and future strategic minority investments for so long as Dr. Phillip Frost . . . is a shareholder in or holds any management or board-level position at [Opko]." In other words, Opko agreed that its investment activities would no longer be controlled by Frost, but rather would be vetted by an independent board committee. The establishment of an independent committee and the retention of an independent consultant to protect a publicly traded company against investment-related misconduct by its Chairman and CEO are extraordinary and unique prophylactic remedies that demonstrate the severity of Frost's misconduct and the harm it caused to Opko's investors. Opko also agreed to pay a civil penalty of $100,000 and to be permanently enjoined from violating Section 13(d) and Rule 13d-1(a) by failing to file required stock-ownership reports on Schedule 13D.

178.   In FGIT's consent judgment, FGIT agreed to be permanently enjoined from violating Section 17(a)(2) by making materially untrue statements or omissions in connection with sales of securities and to be permanently enjoined from participating in any offering of "penny stock."

179.    On January 18, 2019, Groussman and Melechdavid, his investment vehicle, agreed to consent judgments under which Groussman agreed to pay $1,051,360 of disgorgement of ill-gotten gains, $170,555 of interest, and a penalty of $160,000, and he and Melechdavid were permanently enjoined from violating Sections 10(b) and 13(d) of the Exchange Act, Rules 10b-5 and 13d-1(a), and Sections 5 and 17(a) of the Securities Act, and were enjoined for five years from participating in any penny-stock offering.

180.    Following its consent judgments with Frost, Opko, and FGIT, as well as with Ford and Groussman, on March 8, 2019, the SEC filed its First Amended Complaint against the remaining defendants in the SEC Action. Both the SEC's initial complaint and the First Amended Complaint demonstrate that the SEC's investigation was thorough and included access to substantial nonpublic information. Indeed, the First Amended Complaint refers to and quotes from nonpublic emails and documents that were created by, sent to, or received by key individuals and entities, including without limitation Honig, Stetson, BioZone, MabVax, O'Rourke, and Ford. The First Amended Complaint also includes factual discussions of meetings and conversations between those individuals and others. Especially given that the SEC filed its First Amended Complaint after entering into consent judgments with Ford, Frost, FGIT, Opko, Groussman, and others, it is highly probable that the SEC's allegations are based on interviews with those individuals and documents produced by those individuals and entities, in addition to documents and information gathered through subpoenas and informal requests.

181.    On March 21, 2019, Maza settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Section 10(b) of the Exchange Act, Rules 10b-5, and Section 17(a) of the Securities Act and from aiding and abetting any violation of Section 15(d) of the Exchange Act and Rule 15d-1. Maza also agreed that the

court would determine whether he should be ordered to pay disgorgement of ill-gotten gains, a civil penalty, and interest.

182.    On March 26, 2019, Keller settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Sections 10(b) and 15(d) of the Exchange Act, Rules 10b-5 and 15d-1, and Section 17(a) of the Securities Act, from participating in any penny-stock offering, and from acting as an officer or director of any public company. Keller also agreed to pay disgorgement of ill-gotten gains, interest, and a civil penalty in an amount to be determined by the court.

183.    On April 26, 2019, the SEC and Honig notified the court hearing its case against Honig and Frost's other pump-and-dump associates that the SEC staff and Honig had reached an agreement in principle to settle the SEC's charges against Honig, subject to approval by the SEC's commissioners and the court.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

184.    Numerous facts, in addition to those alleged above, support a strong inference of Defendants Frost's and Opko's scienter.

185.    ***Frost's and Opko's false denials of the Lakewood Report.*** In December 2013, the Lakewood Report raised serious questions about whether Frost's and Opko's investments in BioZone were suspicious, and whether investors should be concerned about Frost's deep connections and investment history with Honig, Brauser, and other individuals implicated in numerous suspect investments and business dealings going back years. In response to the Lakewood Report, Opko's stock price declined substantially. In an effort to stop that decline, Opko and Frost made numerous false and misleading statements to the investing public. Opko and Frost issued a press release flatly—and falsely—denying the contents of the Lakewood Report, falsely reassured investors in the StreetSweeper report on Seeking Alpha, and conducted an investor

conference during which they gave additional false reassurances about Opko's investment strategy. Opko's and Frost's direct, categorical denials of the Lakewood Report's accurate descriptions of their entanglement in illicit investment schemes with Honig, Brauser, and their other penny-stock associates support a strong inference of Defendants' knowing or severely reckless misconduct in misrepresenting these matters.

186. ***Intentional fraud.*** Defendant Frost participated actively in pump-and-dump schemes, which by their nature are intentional frauds, and caused Defendant Opko to participate in the schemes as well. While doing so, Defendants repeatedly falsely assured Opko's investors that the Company's supposedly strategic investments—including in BioZone and MabVax—were made solely for legitimate business reasons and that Frost's business acumen and reputation were beneficial for Opko.

187. ***Frost's coordinated sales of BioZone stock in the BioZone Pump and Dump.*** In late September 2013, the false Seeking Alpha article touting Frost's investment in BioZone was published, causing retail investors to pile into BioZone stock and artificially inflating its share price. During the first four days of October 2013, Frost sold nearly 2 million BioZone shares to unsuspecting investors. Frost's sales of BioZone stock during the "dump" were coordinated with approximately $6 million of sales by his associates Honig, Brauser, Groussman, Stetson, and O'Rourke. Such coordinated, suspicious trading activity is highly indicative of fraud.

188. ***Repeated fraud.*** Defendants Frost's and Opko's deliberately fraudulent behavior was repeated with at least two target companies, and their close associates committed similar pump-and-dump schemes on numerous other occasions, often with co-investments by Frost.

189. ***A highly orchestrated modus operandi.*** Defendants Frost's and Opko's fraudulent scheme with their associates was highly orchestrated, involving a consistent modus operandi of

taking control of a small healthcare company by making private investments and reverse-merging the company with a public shell, secretly exercising control over the company through an undisclosed investor group, paying for false favorable articles about the company, and then dumping the artificially inflated stock. This classic pump-and-dump playbook further supports a strong inference of fraudulent intent.

190.    ***Fraudulent use of Frost's reputation among investors.*** Defendants Frost's and Opko's participation was essential to the scheme that they perpetrated with Frost's associates. Frost's reputation as a successful investor and Opko's reputation as his "mini-Berkshire Hathaway" enabled both the "pump"—by driving up the stock price and volume—and the "dump"—by attracting innocent retail investors to buy the stock that Frost and his associates sold at artificially inflated prices. The false, secretly paid-for promotional articles not only misrepresented BioZone's and MabVax's businesses but also emphasized the investments by Frost and Opko as reasons for other investors to buy BioZone and MabVax stock. Indeed, the promotional pieces and press releases quoted Frost. Thus, Frost permitted his associates Honig and O'Rourke to use his and Opko's names in touting BioZone and MabVax in order to create liquidity for the stocks and enable his associates and him to sell stock at artificially inflated prices. In short, Frost and Opko were key enablers of, and participants in, the schemes at the heart of this case.

191.    ***Frost's and Opko's direct participation in the fraudulent transactions.*** Frost was directly and personally involved in the fraudulent investments in BioZone and MabVax. By the Company's own admissions, Frost played a significant role in Opko's investments in smaller companies like BioZone and MabVax. As a result of Frost's significant ownership of Opko common stock, the Company admitted that he had the ability to "significantly impact" Opko's "approval of mergers and other significant transactions."

192.     Indeed, as stated by the SEC and Pederson, Frost participated personally alongside Honig and Brauser in negotiating his and his associates' investments in BioZone with BioZone's management in late 2010, and personally promised that the investments would lead to $8 million to $15 million in funding for BioZone's research and development. Frost had no intention of actually providing that funding, and he knew after his group took control of BioZone that the funding had not been provided and that BioZone was compelled to end its product-development efforts in mid-2012. Yet he permitted his associates, as stated by the SEC, to secretly pay Ford to publish a materially false article about BioZone on September 16, 2013, that both touted Frost's and Opko's investment in that company and falsely stated that the company had a formulation ready for testing for the billion-dollar injectable drug market.

193.     As stated by Pederson, BioZone signed a binding letter of intent with "the Frost Gang," consisting of Frost, Brauser, and Honig, in January 2011. As stated by the SEC, the letter of intent was on "Honig, Brauser, [Frost] Group" letterhead. Pederson stated that he attended meetings in the conference room outside Frost's office in Frost's Ivax building in Miami in January or February 2011 with Frost, Maza, Kesner, Honig, Brauser, and other Frost associates, during which Frost and his associates agreed to invest millions of dollars in BioZone to fund its drug development, and that Frost himself gave his word that his group would provide or arrange a total of about $15 million of funding for BioZone.

194.     As stated by the SEC, Frost also participated personally alongside Honig and Brauser in arranging for the sale of unprofitable assets to BioZone in exchange for 8,345,310 shares of BioZone stock and the obligation of BioZone to register those shares with the SEC. As stated by Pederson, these worthless assets were sold to BioZone by a private company called Aero

controlled by Frost and his associates, and Frost received 3,800,000 of the BioZone shares issued for Aero's assets.

195.    As stated by the SEC, with Frost's knowledge and consent, Honig and Brauser installed Maza, one of their associates, as BioZone's CFO and a director, and later as its CEO. But Honig and Brauser exercised de facto control over BioZone's management with Frost's knowledge and consent. BioZone's SEC filings identified only Frost, not Honig or Brauser, as a control person despite his knowledge of Honig's and Brauser's control over BioZone.

196.    As stated by Pederson, Maza controlled BioZone's finances and day-to-day operations, was in close communication with Frost, and carried out Frost's plan to BioZone's detriment, firing key employees and turning a profitable business into an unprofitable one. Pederson also alleged that Maza acted in concert with Frost in firing Fisher, a founder, director, and officer of BioZone who objected to Maza's unlawful actions in running the company.

197.    The SEC likewise stated that Maza sought approval from Honig, Brauser, and Frost for material business decisions and sent Honig, Brauser, and Frost updates at least every month providing details on business operations and opportunities and seeking their approval for material business decisions.

198.    After being ousted by Maza and Frost, Fisher sued BioZone, Brauser, Maza, and Frost in July 2012 for failing to deliver to him 6 million BioZone shares that he had been promised. That case was settled for $2 million in September 2013.

199.    As stated by the SEC, Frost agreed with Honig, Brauser, Maza, Keller, and another associate to acquire, hold, or sell their BioZone shares in concert. But Frost allowed this company that his group controlled to file SEC reports that did not, as required by Section 13 of the Exchange Act, disclose the existence of the control group.

200.    In short, Frost was personally involved in numerous aspects of the fraudulent investments at issue—involvement which further supports an inference of his and Opko's scienter.

201.    ***Frost's concealment of the secret control group.*** Frost also participated in the concealment of the existence of a secret control group, consisting of him and his associates, that controlled BioZone and MabVax. Concealing the existence of this group and the extent of its shared ownership was critical to the pump-and-dump schemes because it prevented other investors from realizing that insiders were preparing to dump large amounts of stock after pumping up the price. As stated by the SEC, Frost knew that one of the goals of the two private placements through which he, Southern Biotech, FGIT, and Opko invested in MabVax was to generate market interest in MabVax stock in preparation for a planned stock promotion. Frost's knowledge of the pump-and-dump scheme relating to MabVax supports a strong inference that he knew of (or was severely reckless with respect to) the falsity of Opko's statements about MabVax.

202.    Frost concealed the full extent of his investments in MabVax by investing not only in his own name and through FGIT but also through Southern Biotech, an investment vehicle owned by him, Honig, and Brauser. As stated by the SEC, Southern Biotech's three owners used it to "funnel their investments in issuers, including [MabVax], thus shielding the size of their individual investments from disclosure."

203.    Similarly, MabVax stated in a malpractice complaint against Kesner (discussed further in ¶¶ 101 and 212) that Southern Biotech was used to conceal the relationships among Honig, Frost, and other members of their group from MabVax.

204.    As stated by the SEC, Frost, FGIT, Opko, and Southern Biotech were obligated to file Schedule 13Ds disclosing that they were part of a control group together with Honig, Brauser, Groussman, Stetson, and O'Rourke that had agreed to buy, hold, and sell MabVax shares in

concert, and that directed the company's management and policies. But Frost and FGIT concealed the existence of the control group by filing a false Schedule 13G on April 10, 2015, and false Schedule 13G/As on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018, failing to disclose the existence of the control group and falsely claiming to be passive investors. Frost also failed to file the required Schedule 13Ds for Opko and Southern Biotech with respect to MabVax.

205.    Frost's concealment of the full scope of his investments in MabVax and of his and Opko's participation in the control group supports a strong inference that he knew of (or was severely reckless with respect to) the scheme and the falsity of Opko's statements about MabVax.

206.    ***The need for prophylactic measures to protect Opko from Frost.*** Further support for a strong inference of Frost's and Opko's scienter is the Company's agreement to settle the SEC action and establish a Management Investment Committee that will make recommendations to an Independent Investment Committee of the Board of Directors to handle existing and future strategic minority investments for as long as Frost is a shareholder in or holds any management or board-level position at Opko. This settlement demonstrates that, far from being a key asset for Opko, as Defendants assured Opko investors during the Class Period, Frost's direction of Opko's investments in other companies is a dangerous risk that requires extraordinary controls to prevent him from committing fraud again.

207.    ***A close-knit group of serial fraudsters.*** Frost's (and therefore Opko's) scienter is further supported by Frost's close, longstanding association with the other participants in the pump-and-dump scheme and his involvement in other, similar schemes with them targeting other small companies. Defendants Frost's and Opko's fraudulent scheme involved the same small group of players closely associated with Frost for many years: Honig, Stetson, Brauser, Ford,

O'Rourke, Groussman, and their investment vehicles. This group repeatedly engaged in similar pump-and-dump schemes together, shared business addresses and letterhead, shared joint-ownership investment companies (such as Southern Biotech) that they used to conceal their frauds, and invested alongside one another for many years—and did so even as Honig was publicly revealed to be a serial stock promoter, thus attracting scrutiny from market participants and ultimately the SEC.

208.    For example, Lakewood identified the Frost, Honig, and Brauser relationship as a cause for concern in its December 2013 Report, "Opko Health: the Placebo Effect." Lakewood stated that Honig and Brauser were "two serial stock promoters that have each been the subject of multiple lawsuits." And in a March 6, 2018 article published on sharesleuth.com ("sharesleuth"), business reporter Chris Carey ("Carey") identified "an elaborate, long-running effort to spark interest in obscure public companies by creating bullish stories that were posted and reposted across the internet." Carey found over 60 writers, the majority of whom were fictitious, who systematically promoted companies connected to Honig, Brauser, and Frost. The sharesleuth piece identified almost 600 bullish articles about Honig-related companies, the majority of which were posted on Seeking Alpha. Writers identified by sharesleuth included Ford. Carey's article also identified other entities related to Frost, Honig, and Brauser involved in the stock-promotion scheme, including Pershing Gold, Bullfrog Gold, ChromaDex, Sevion, and VBI Vaccines, Inc. ("VBI").

209.    As stated by the SEC, Frost's associates Honig, Brauser, Stetson, and O'Rourke invested together in at least 19 issuers at or about the same time from 2011 to 2019, and Frost invested with them in a number of these deals. In most cases, this group acquired large amounts of stock at below-market prices, exercised control over the company, dictated a publicity-

generating event such as an investment by Frost, paid for favorable articles about the company, and then dumped the stock at artificially inflated prices.

210.   As stated by the SEC, Brauser and Honig rented offices from at least October 2010 to approximately 2013 at 4400 Biscayne Boulevard in Miami, Florida—the former Ivax building that is owned by Frost and also houses his office.

211.   Ford wrote touting articles not only about BioZone but also in 2012–2013 about Opko and other companies controlled by Frost or his associates, including Pershing Gold, MusclePharm, ChromaDex, and Vringo. Indeed, the SEC Complaint states that in November– December 2013, Honig, O'Rourke, and Brauser secretly paid Ford to write an article touting Opko.

212.   As stated by the SEC, the same lawyer, Kesner, and his firm were retained at Honig's insistence by BioZone, MabVax, and other issuers in which Honig and Frost invested. *Barron's* reported on October 4, 2018, in an article entitled "The Lawyer at the Center of the SEC Pump-and-Dump Case" that, during the past decade, Kesner represented nearly two dozen public companies backed by Honig or other defendants in the SEC action against Frost, Honig, and others. Kesner resigned from his law firm shortly before the SEC filed its action, and MabVax sued him and his firm for malpractice, alleging that the lawyers served the interests of the Honig group to MabVax's detriment while representing MabVax, including by concealing the relationship between Frost and Honig through Southern Biotech.

213.   As stated by the SEC, during 2015 and 2016, Honig, Groussman, Brauser, Stetson, and O'Rourke committed another pump-and-dump scheme using a company called MGT. Although Frost and Opko did not participate in the MGT scheme, their close association with these individuals who perpetrated another pump-and-dump during the same time period as the BioZone

and MabVax schemes supports a strong inference that they knew of (or were severely reckless with respect to) these individuals' modus operandi.

214.    In another example of Frost's long history of associating with fraudsters, Frost established Opko in 2007 by merging two private pharmaceutical companies into eXegenics, a publicly traded company. eXegenics disclosed in a December 2006 proxy statement for the merger that Frost's meetings with eXegenics leading to his investment in the company were arranged by Franklin N. Wolf, who also invested in the company along with Frost. Wolf was barred from the securities industry by the SEC and FINRA for penny-stock violations in 1994, fined a total of $750,000, and ordered to pay $7.9 million in restitution.

215.    Similarly, Frost caused Opko to acquire BioReference Laboratories, a diagnostics business, for $1.47 billion in 2015 even though BioReference's chief information officer was a disbarred attorney with a criminal conviction for misappropriating client funds, its executive vice president of sales and marketing was publicly accused of receiving $1.6 million through extortion and fraud, and its founder, chairman, president, and CEO had caused BioReference to receive funding from brokers who were associated with the Mafia or involved in pump-and-dump schemes.

216.    Frost's scienter is further supported by his longstanding association with Honig, Brauser, Groussman, and Stetson in numerous penny-stock investments that bear indicia of pump-and-dump schemes, including VBI (invested in by Opko, Honig, and Brauser), ChromaDex (invested in by Opko and FGIT, co-chaired by Honig and Brauser, and touted by Ford), MusclePharm (invested in by FGIT, Honig, and Brauser and touted in anonymous emails to investors), Sevion (invested in by Opko, Honig, and Brauser), TransEnterix (invested in by FGIT and Brauser), IZEA, Inc. (invested in by Honig, Brauser, and FGIT), Pershing (managed by Honig

and invested in by FGIT), and PolarityTE, Inc. (invested in by FGIT, Honig, and Brauser; Stetson was its CFO and was terminated following the SEC Complaint). Frost's frequent investments alongside these individuals supports a strong inference that he is familiar with their modus operandi and knew of (or was severely reckless with respect to) their pump-and-dump activities at BioZone and MabVax. The following chart published by Citron on October 18, 2018 illustrates the disastrous impact these and other penny stocks in which Frost and his associates were involved had on other investors:

| Company | Business | Current Share Price | Down From Peak | Honig | Brauser | Frost | Groussman | Stetson |
|---------|----------|---------------------|----------------|-------|---------|-------|-----------|---------|
| | | | | **Shareholders / Involvement** | | | | |
| Marathon Patent Group | Crypto | $0.61 | -98.3% | ☑ | ☑ | ☑ | ☑ | ☑ |
| Orbital Tracking | Data Tracking | $0.41 | -100.0% | ☑ | ☑ | ☑ | ☑ | ☑ |
| Muscle Pharm | Health Supplements | $1.00 | -99.9% | ☑ | ☑ | ☑ | ☑ | ☑ |
| Document Security Systems | Security Tech | $1.05 | -99.2% | ☑ | ☑ | ☑ | ☑ | ☑ |
| Passport Potash | Mining | $0.00 | -100.0% | ☑ | ☑ | ☑ | ☑ | |
| Pershing Gold | Mining | $1.61 | -92.2% | ☑ | ☑ | ☑ | ☑ | ☑ |
| Vapor Group | E-Cigs | $0.00 | -100.0% | ☑ | ☑ | ☑ | ☑ | |
| Mabvax | Biotech | $0.43 | -100.0% | ☑ | ☑ | ☑ | | ☑ |
| Sevion Therapeutics | Biotech | $13.85 | -99.8% | ☑ | ☑ | ☑ | | |
| Izea Inc | Digitial Marketing | $1.69 | -99.9% | ☑ | ☑ | ☑ | | |
| Usell.com | Cell Phone Recycling | $0.22 | -100.0% | ☑ | ☑ | ☑ | | |
| Cocrystal Pharma | Biotech | $2.87 | -98.1% | ☑ | ☑ | ☑ | | |
| Riot Blockchain | Crypto | $2.72 | -93.0% | ☑ | | | ☑ | ☑ |
| **PolarityTE** | **Biotech** | **$14.60** | **-62.5%** | ☑ | ☑ | ☑ | ☑ | ☑ |

217.    In sum, this group's long history together, close and continued business associations in the face of regulatory scrutiny, and repeated fraudulent common behavior further support an inference of scienter as to Frost and Opko.

* * *

218.    At a minimum, the foregoing allegations support a strong inference that Frost acted with severe recklessness.

219.    As the most senior executive of Opko, Frost's knowledge of the scheme (or severe recklessness) is imputed to the Company for the purpose of establishing scienter.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

220.    Throughout the Class Period, Defendants made a host of materially false and misleading statements and omissions that were disseminated to investors during investor calls and presentations, in Opko's SEC filings and press releases, and through various news and media outlets. Defendants' false and misleading statements and omissions generally fall into six categories: (1) statements responding to and denying the assertions in the Lakewood Report, (2) statements concerning Opko's purportedly legitimate investments in BioZone and MabVax, (3) statements concerning Opko's investment strategy, (4) promotional articles and press releases concerning Opko's investments in BioZone and MabVax, (5) statements concerning Frost's reputation and importance to Opko's success, and (6) Defendants' false and misleading Schedule 13Gs.

### A.    <u>Defendants' Materially False and Misleading Statements and Omissions Issued in Response to the Lakewood Report</u>

221.    As noted above, the Lakewood Report raised concern in the market about Frost's connections to serial stock promoters Honig and Brauser and his history of questionable penny-stock investments and cast doubt on Opko's stated investment strategy, causing Opko's stock price to decline significantly. In order to stem this decline and assuage the market, Frost and Opko made a series of false denials of the Lakewood Report. In reality, and unknown to investors, Lakewood's suspicions about Frost and Opko's association with Honig and Brauser and investment in BioZone were accurate: Frost and Opko invested in BioZone, and later MabVax, as part of fraudulent pump-and-dump schemes.

222.     Just two days after the Lakewood Report was issued, on December 13, 2013, Opko issued a press release entitled "OPKO To Hold Investor Conference." In the press release, Opko scheduled an investor conference for December 17, 2013 and stated regarding the Lakewood Report:

> We are aware of the report, which we believe is ***based on distorted and inaccurate information***. We continue to believe in our ***unique business strategy and in the importance of OPKO's therapeutic and diagnostic product candidates.*** We are fully committed to developing and commercializing our products and we look forward to updating investors in a timely manner.

223.     This statement was materially false and misleading. It was materially false and misleading to describe the Lakewood Report as "based on distorted and inaccurate information," and to reassure investors that the Company's "business strategy" was to invest in promising "therapeutic and diagnostic product candidates" when, in truth, Frost and Opko were involved in pump-and-dump schemes with Honig and Brauser, including with respect to the investment in BioZone.

224.     Frost and Rubin participated in a Q&A interview with "TheStreetSweeper" on Seeking Alpha on December 16, 2013 entitled "Opko Health: Standing Bullish Following Q&A With Dr. Phillip Frost." In response to a question about the Lakewood Report's allegations that Frost bought Opko stock as a red herring to lure in investors, Frost assured investors that Opko's business and investments were legitimate, stating:

> I can't keep people from being influenced one way or another. ***All I know is I invest because I don't know of another investment I could make that I would be more comfortable with. It's not part of a marketing strategy***. Because if I didn't believe in it I would be throwing away an awful lot of money. I'm not the type of person who throws away money.

225.     It was materially false and misleading for Frost to represent that Opko's business activities were legitimate when, in truth, Frost and Opko participated in the BioZone (and later MabVax) pump-and-dump schemes.

226.     On December 16, 2013, the Israeli news organization *Globes* published an online news article entitled "Frost: Opko's share price is extremely low." The article repeated the statement quoted in ¶ 224 above, which was materially false and misleading for the same reason.

227.     On December 17, 2013, Opko held an investor conference and distributed an investor presentation in an attempt to reassure investors in the wake of the Lakewood Report. The investor presentation touted Opko's "***Opportunistic Investments***," and during the conference, Frost stated that Opko's investments were based on promising medical technology, stating that Opko's

> ***strategy is straightforward, though a bit unique.*** We want to focus on less-crowded parts of the industry. We want to work with products in late-stage development. . . . ***We want to focus on products with large market potential. All of our products have important market potential. We want to develop an international business by buying small; profitable; growing; and above all, well-managed businesses that can also distribute products we develop. . . . Finally, we want to invest in small companies with novel technologies as investments for appreciation as well as for product rights.***

228.     These statements were materially false and misleading. It was materially false and misleading for Frost to state that Opko "focus[ed] on products with large market potential," invested in "well-managed businesses that can also distribute products we develop," and "want[ed] to invest in small companies with novel technologies as investments for appreciation as well as for product rights," when in fact Opko was investing in multiple companies as part of a pump-and-dump schemes.

229.     During the same December 17, 2013 conference, Defendant Frost stated that Opko has "***a management team with a track record of generating significant return to the shareholders.*** I have always said that when you have good people, good things happen. We have lots of such good people."

230.    These statements were materially false and misleading because rather than focusing

on "generating significant return to [Opko] shareholders," Defendants invested in multiple

companies as part of a fraudulent pump-and-dump scheme to the detriment of Opko investors.

**B.      Defendants' Materially False and Misleading Statements Concerning Opko's Investments in BioZone, Cocrystal, and MabVax**

231.    Throughout the Class Period, Defendants made materially false and misleading

statements concerning Opko's purportedly "strategic investments" in BioZone, Cocrystal, and

MabVax. Defendants told investors that they invested in these companies for purely legitimate

reasons—because the companies were "perceive[d] to have valuable proprietary technology and

significant potential to create value for OPKO as a shareholder." In truth, Defendants invested in

BioZone, Cocrystal, and MabVax as a part of their fraudulent pump-and-dump scheme.

**1.      Defendants' Materially False and Misleading Statements Concerning Opko's Investments in BioZone**

232.    As discussed above, BioZone is a pharmaceutical company led by Brian Keller that

is now known as Cocrystal Pharma, Inc. ("Cocrystal") following a merger of BioZone and

Cocrystal Discovery, Inc. on January 2, 2014. As part of their pump-and-dump scheme, in 2010,

Frost and his associates approached BioZone management and proposed a reverse merger.

BioZone's post-merger filings with the SEC never disclosed Frost's colleagues—including Honig

and Brauser—as control persons, but by the beginning of the Class Period, Frost, his associates,

FGIT, and The Frost Group owned approximately 45% of BioZone. During the Class Period,

Defendants made materially false and misleading statements about their investment in BioZone.

233.    On November 12, 2013, Opko filed with the SEC a Form 10-Q for the period ended

September 31, 2013, signed by Defendant Frost (the "Third Quarter 2013 Form 10-Q"). In the

Third Quarter 2013 Form 10-Q, Defendants Opko and Frost stated that ***"[w]e have made strategic***

***investments in development stage and emerging companies."*** Defendants referred investors to

"Note 5" of the Third Quarter 2013 Form 10-Q, which listed "BZNE common stock" (BioZone) as one such investment.

234.    Defendants Opko and Frost made substantially similar statements to those in ¶ 233 concerning Opko's "strategic investment" in BioZone in Opko's Form 10-K for the year ended December 31, 2013, filed on March 3, 2014 and signed by Frost (the "2013 Form 10-K").

235.    Opko's 2013 Form 10-K further contained a section entitled "Strategic Investments," which explained that Opko "[has] and may continue to make investments in other early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder." That section contained a bullet point describing Opko's investment in "Biozone Pharmaceuticals, Inc." and the BioZone "merger with Cocrystal Discovery, Inc." The 2013 Form 10-K also stated that the BioZone investment was supposedly driven by Opko's receipt of a "world-wide license for the development and commercialization of products utilizing BZNE's proprietary drug delivery technology, including a technology called QuSomes."

236.    The statements described in ¶¶ 233-35 were materially false and misleading. It was materially false and misleading to describe the BioZone investment as a legitimate "strategic investment" when it was actually made as part of Defendants' pump-and-dump scheme to the detriment of Opko investors. It was also false and misleading to highlight Defendants' investment in BioZone as a legitimate investment that was based on "valuable proprietary technology and significant potential to create value for OPKO as a shareholder," and Opko's license for BioZone's "proprietary drug delivery technology," when in reality this investment was made as a part of Defendants' pump-and-dump scheme carried out to the detriment of Opko shareholders.

237.    On December 10, 2013, Opko participated in a conference call with investors hosted by Oppenheimer ("the 2013 Oppenheimer Healthcare Conference"). In its investor presentation during the 2013 Oppenheimer Healthcare Conference, the Company identified its *"Opportunistic Investments" in "Innovative Technologies"* as a driver of Opko's "High Growth," as well as its *"Strategic Investments" in "Proprietary Technologies with Significant Upside Potential."* Notably, that list of "Proprietary Technologies with Significant Upside Potential" included Opko's "~11% equity interest" in BioZone.

238.    These statements were materially false and misleading. Contrary to Defendants' statements that the investment in BioZone was based on BioZone's supposedly "innovative technologies" and "proprietary technologies with significant upside potential" for Opko shareholders, in truth, that investment was part of a pump-and-dump scheme carried out to the detriment of Opko shareholders. Further, BioZone had no valuable proprietary or innovative technology, and neither Frost nor his associates even sought to develop any technology that BioZone had, but rather shut down its research-and-development operation after assuming control of the company.

239.    On January 23, 2014, Opko issued a press release entitled "BioZone Receives Strategic Investment From OPKO Health, Inc." (the "BioZone Press Release"). The BioZone Press Release stated that the "private placement offering included the sale of 5,500,000 shares of restricted common stock and 5,500,000 10-year warrants exercisable at $0.50 per share. *Proceeds from the financing will be used for R&D as well as general working capital.*" The BioZone Press Release further quoted BioZone's newly appointed CEO and Chairman, Gary Wilcox, as stating that BioZone "appreciate[s] the support and confidence these accredited investors [Opko and Frost] have in our company. This successful equity financing will *allow us to continue to focus*

*on developing our small molecule inhibitors of the viral replication complex and move towards the commercialization and partnering of our technologies.*"

240.    These statements were materially false and misleading. It was materially false and misleading to state that the investment in BioZone was a "strategic investment," when it was part of Defendants' fraudulent pump-and-dump scheme. It was further false and misleading for Opko to highlight its investment in BioZone as legitimate funding for research and development when in truth neither Frost nor his associates even sought to develop any technology that BioZone had, but rather shut down its research-and-development operation after assuming control of the company.

### 2.    Defendants' Materially False and Misleading Statements Concerning Opko's Investments in Cocrystal

241.    As discussed above, effective January 2014, BioZone merged with Cocrystal under the direction of Frost and his associates. During the Class Period, Defendants made materially false and misleading statements about their investment in Cocrystal.

242.    On May 9, 2014, Opko filed with the SEC a Form 10-Q for the period ended March 31, 2014, signed by Defendant Frost (the "First Quarter 2014 Form 10-Q"). In the First Quarter 2014 Form 10-Q, Opko and Frost stated that **"*[w]e have made strategic investments in development stage and emerging companies***.**" Defendants referred investors to "Note 5" of the First Quarter 2014 Form 10-Q, which listed "Cocrystal Pharma, Inc." as one such investment, and described the recent "Biozone and Cocrystal [] merger transaction pursuant to which Cocrystal was the surviving entity[.]"

243.    Defendants Opko and Frost made substantially similar statements to those in ¶ 242 concerning Opko's "strategic investment" in Cocrystal in Opko's following filings with the SEC:

- Form 10-Q for the quarter ended June 30, 2014, filed on August 11, 2014 and signed by Frost (the "Second Quarter 2014 Form 10-Q");

- Form 10-Q for the quarter ended September 30, 2014, filed on November 7, 2014 and signed by Frost (the "Third Quarter 2014 Form 10-Q");

- Form 10-K for the year ended December 31, 2014, filed on February 27, 2015 and signed by Frost (the "2014 Form 10-K");

- Form 10-Q for the quarter ended March 31, 2015, filed on May 11, 2015 and signed by Frost (the "First Quarter 2015 Form 10-Q");

- Form 10-Q for the quarter ended June 30, 2015, filed on August 5, 2015 and signed by Frost (the "Second Quarter 2015 Form 10-Q");

- Form 10-Q for the quarter ended September 30, 2015, filed on November 9, 2015 and signed by Frost (the "Third Quarter 2015 Form 10-Q");

- Form 10-K for the year ended December 31, 2015, filed on February 29, 2016 and signed by Frost (the "2015 Form 10-K");

- Form 10-Q for the quarter ended March 30, 2016, filed on May 9, 2016, and signed by Frost (the "First Quarter 2016 Form 10-Q");

- Form 10-Q for the quarter ended June 30, 2016, filed on August 8, 2016, and signed by Frost (the "Second Quarter 2016 Form 10-Q");

- Form 10-Q for the period ended September 30, 2016, filed on November 7, 2016, and signed by Frost (the "Third Quarter 2016 Form 10-Q");

- Form 10-K for the year ended December 31, 2016, filed on March 1, 2017 and signed by Frost (the "2016 Form 10-K");

- Form 10-Q for the period ended March 30, 2017, filed on May 10, 2017, and signed by Frost (the "First Quarter 2017 Form 10-Q");

- Form 10-Q for the period ended June 30, 2017, filed on August 8, 2017, and signed by Frost (the "Second Quarter 2017 Form 10-Q");

- Form 10-Q for the period ended September 30, 2017, filed on November 8, 2017, and signed by Frost (the "Third Quarter 2017 Form 10-Q");

- Form 10-K for the year ended December 31, 2017, filed on March 1, 2018, and signed by Frost (the "2017 Form 10-K");

- Form 10-Q for the period ended March 30, 2018, filed on May 8, 2018, and signed by Frost (the "First Quarter 2018 Form 10-Q"); and

- Form 10-Q for the period ended June 30, 2018, filed on August 7, 2018, and signed by Frost (the "Second Quarter 2018 Form 10-Q").

244.    Opko's 2014 Form 10-K further contained a section entitled "Strategic Investments," which explained that Opko "[has] and may continue to make investments in other early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder." That section described Opko's investment in "Cocrystal Pharma, Inc., a biotechnology company developing new treatments for viral diseases[.]"

245.    The statements described in ¶¶ 242-44 were materially false and misleading. It was materially false and misleading to describe the Cocrystal investment as a legitimate "strategic investment" when it was actually made as part of Defendants' pump-and-dump scheme to the detriment of Opko investors. It was also false and misleading to highlight Defendants' investment in Cocrystal as a legitimate investment that was based on "valuable proprietary technology and

significant potential to create value for OPKO as a shareholder" when in reality this investment was made as a part of Defendants' pump-and-dump scheme carried out to the detriment of Opko shareholders.

246.    On November 27, 2013, the *South Florida Business Journal* published an article entitled "Billionaire Frost ushers merger of drug firms with Opko ties." The article described the merger of BioZone and Cocrystal and quoted Frost as follows:

> We are excited about the breadth of the management team at Cocrystal Discovery. In addition to the ***groundbreaking technology*** that Cocrystal Discovery possesses, I am always one to bet on management. With Dr. Wilcox's top-notch pedigree and successes in bringing products to market, ***I am confident in the future of this company. This merger will provide greater resources to help bring products of the combined company to market and offer shareholders an opportunity to realize significant value on their investment.***

247.    Frost's statement in ¶ 246 was materially false and misleading. Contrary to Frost's statement that the BioZone-Cocrystal merger was based on "groundbreaking technology" and would "offer shareholders an opportunity to realize significant value on their investment," Defendants invested in BioZone as part of a pump-and-dump scheme to the detriment of Opko shareholders, and the BioZone-Cocrystal merger helped conceal the scheme.

248.    On December 17, 2013, *AJU News* published an article entitled "Biozone merges with Cocrystal, focusing on antiviral drugs." The article quoted Frost regarding the alleged reasons for the merger: "There are compelling advantages to the technologies for small molecule inhibitors of the viral replication complex. In addition to the groundbreaking technology that Cocrystal Discovery possesses, I am always one to bet on management."

249.    These statements were materially false and misleading when made. Contrary to Frost's statement that the BioZone-Cocrystal merger was based on compelling technological advantages and the skill of the companies' management, Defendants invested in BioZone as part of a pump-and-dump scheme, and Defendants used the Cocrystal merger to conceal the scheme.

250.    On January 14, 2014, Opko participated in an investor conference hosted by J.P. Morgan (the "2014 J.P. Morgan Healthcare Conference"). In its investor presentation during the 2014 J.P. Morgan Healthcare Conference, Opko identified its ***"Opportunistic Investments" in "Innovative Technologies"*** as a driver of Opko's "High Growth," as well as its ***Strategic Investments" in "Proprietary Technologies with Significant Upside Potential."*** Notably, that list of "Proprietary Technologies with Significant Upside Potential" included Opko's "~16% equity interest" in "CoCrystal Discovery, Inc" and referenced Cocrystal's "merger with Biozone Pharmaceuticals, Inc."

251.    Opko made substantially similar statements to those in ¶ 250 in investor presentations and industry conferences held on June 3, 2014, December 10, 2014, January 14, 2015, February 26, 2015, June 4, 2015, and September 1, 2015.

252.    These statements were materially false and misleading. Contrary to Defendants' statements that the investment in Cocrystal was based on Cocrystal's supposedly "innovative technologies" and "proprietary technologies with significant upside potential" for Opko shareholders," in truth that investment was part of a pump-and-dump scheme carried out to the detriment of Opko shareholders. Further, Cocrystal had no valuable proprietary or innovative technology, and neither Frost nor his associates even sought to develop any technology that Cocrystal had, but rather shut down its research-and-development operation after assuming control of the company.

253.    On December 10, 2014, Defendants Opko and Frost participated in an investor conference hosted by Oppenheimer (the "2014 Oppenheimer Healthcare Conference"). During the 2014 Oppenheimer Healthcare Conference, Frost discussed Opko's investment in Cocrystal and

stated that "***Cocrystal is an example of the type of investment that we are making, where there is a possibility of a home run with a very small investment.***"

254.    This statement was materially false and misleading. Far from being a legitimate investment that could amount to a "home run" for Opko shareholders, Opko's investment in BioZone/Cocrystal was made as part of a fraudulent pump-and-dump scheme to the detriment of Opko shareholders.

### 3. Defendants' Materially False and Misleading Statements Concerning Opko's Investment in MabVax

255.    As discussed above, MabVax was another company that Frost and his associates "pumped and dumped." After Honig facilitated a reverse merger between MabVax and a publicly traded shell company in July 2014, Opko and Frost and his associates gained a controlling ownership interest in MabVax, specifically through Series D and Series E private placements carried out in March and April 2015, all the while never disclosing their relationship and shared interests to MabVax or to the public. During the Class Period, Defendants made materially false and misleading statements about their investment in MabVax.

256.    In Opko's Second Quarter 2015 Form 10-Q, Defendants Opko and Frost stated that "***[w]e have made strategic investments in development stage and emerging companies.***" Defendants referred investors to "Note 5" of the Second Quarter 2015 Form 10-Q, which included "MabVax Therapeutics Holdings, Inc." as one such investment.

257.    Defendants Opko and Frost made substantially similar statements concerning Opko's "strategic investment" in MabVax to those in ¶ 256 in Opko's following filings with the SEC: Third Quarter 2015 Form 10-Q, 2015 Form 10-K, First Quarter 2016 Form 10-Q, Second Quarter 2016 Form 10-Q, Third Quarter 2016 Form 10-Q, 2016 Form 10-K, First Quarter 2017

Form 10-Q, Second Quarter 2017 Form 10-Q, Third Quarter 2017 Form 10-Q, 2017 Form 10-K, First Quarter 2018 Form 10-Q, and Second Quarter 2018 Form 10-Q.

258.   The statements described in ¶¶ 256-57 were materially false and misleading. It was materially false and misleading to describe the MabVax investment as a legitimate "strategic investment" when it was actually made as part of Defendants' pump-and-dump scheme to the detriment of Opko investors. It was also false and misleading to highlight Defendants' investment in MabVax as a legitimate investment that was based on "valuable proprietary technology and significant potential to create value for OPKO as a shareholder" when in reality this investment was made as a part of Defendants' pump-and-dump scheme carried out to the detriment of Opko shareholders.

259.   On June 4, 2015 Opko released a public investor presentation. In the investor presentation, the Company identified its *"Opportunistic Investments" in "Innovative Technologies"* as a driver of Opko's "High Growth," as well as its *"Strategic Investments" in "Proprietary Technologies with Significant Upside Potential."* Notably, that list of "Proprietary Technologies with Significant Upside Potential" included Opko's "~7% equity interest" in "MabVax Therapeutics Holdings, Inc."

260.   Opko made substantially similar statements to those in ¶ 259 in an investor presentation on September 1, 2015.

261.   These statements were materially false and misleading. Contrary to Defendants' statements that the investment in MabVax was based on MabVax's supposedly "innovative technologies" and "proprietary technologies with significant upside potential" for Opko shareholders," in truth, that investment was part of a pump-and-dump scheme carried out to the detriment of Opko shareholders. Further, MabVax had no valuable proprietary or innovative

technology, and neither Frost nor his associates even sought to develop any technology that MabVax had, but rather shut down its research and development operation after assuming control of the company.

262.    On April 6, 2015, *India Pharma News* published an article covering Opko's financing of MabVax entitled "MabVax Therapeutics Announces Closing of Financing." In the article, Frost was quoted commenting on Opko's financing of MabVax:

> The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. The early data for its HuMab 5B1 antibody are encouraging and MabVax has a pipeline of dozens of novel antibody leads on its discovery platform from which it may select promising candidates to develop through clinical trials.

263.    Frost's statement quoted in ¶ 262 above was published again the following day, April 7, 2015, in the *South Florida Business Journal*.

264.    The statements quoted in ¶¶ 262-63 describing MabVax's technology and research and development in the context of Opko's financing were materially false and misleading. Contrary to the representation that the investment in MabVax was based on its "novel" and "important" technology, that investment was made as part of a fraudulent pump-and-dump scheme.

265.    On October 8, 2015, Opko issued a press release entitled "OPKO Health, Inc. Participates in Latest Round of Financing for MabVax Therapeutics" (the "October 8, 2015 Press Release"). In the October 8, 2015 Press Release, Frost stated regarding Opko's investment in MabVax that supplemental financing from a public offering "will ***provide MabVax with additional funds to advance the Company's lead antibody program into early clinical trials next year potentially reaching key milestones by mid-year next year.***"

266.    This statement was materially false and misleading. Contrary to Frost's statement that the MabVax investment was based on developing MabVax's "lead antibody program," that

investment was made as part of a fraudulent pump-and-dump scheme. Similarly, contrary to Frost's statement that the investment was to "provide MabVax with additional funds" to enable it to "reach[] key milestones by mid-year next year" in its technology, that investment was made as part of a fraudulent pump-and-dump scheme.

### C.    Defendants' False and Misleading Statements Concerning Opko's Investment Strategy

267.    Throughout the Class Period, Opko and Frost made false and misleading statements concerning Opko's purported "strategic" investments in early-stage healthcare companies that Defendants claimed were legitimate and would bring growth to the Company and value to Opko shareholders. These statements were materially false and misleading because several of Opko's investments were, in truth, part of Defendants' fraudulent scheme to pump and dump their stock in those companies.

268.    On March 3, 2014, Opko filed its 2013 Form 10-K. The 2013 Form 10-K discussed Opko's "growth strategy" and stated specifically that

> ***We expect our future growth to come from leveraging our proprietary technology and development strengths, and opportunistically pursuing complementary, accretive, or strategic acquisitions and investments.***
>
> *   *   *
>
> We have and expect to continue to be opportunistic and pursue complementary or strategic acquisitions, licenses and investments. Our management team has significant experience in identifying, executing and integrating these transactions. ***We expect to use well-timed, carefully selected acquisitions, licenses and investments to continue to drive our growth, including . . . [e]arly stage investments. We have and may continue to make investments in early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder.***

269.    Opko made substantially similar statements in its 2014, 2015, 2016, and 2017 Form 10-Ks filed with the SEC.

270.    These statements were materially false and misleading. It was materially false and misleading for Frost and Opko to state that Opko made "investments in early stage companies" based on their "valuable proprietary technology and significant potential to create value for OPKO as a shareholder," when Opko and Frost were investing in multiple early-stage companies as part of a fraudulent pump-and-dump scheme to the detriment of Opko investors.

271.    On May 11, 2015, Opko filed its First Quarter 2015 Form 10-Q, in which Opko stated that it "[has] made investments in other early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for us as a shareholder or member."

272.    Opko made substantially similar statements in all of its subsequent Form 10-Qs and Form 10-Ks filed throughout the Class Period.

273.    These statements were materially false and misleading. Contrary to the statement that Opko made "investments in early stage companies" based on their "valuable proprietary technology and significant potential to create value for OPKO as a shareholder," Opko and Frost were investing in multiple early-stage companies as part of fraudulent pump-and-dump schemes to the detriment of Opko investors.

274.    On February 29, 2016, Opko filed its 2015 Form 10-K. Opko's 2015 Form 10-K contained a section entitled "Strategic Investments," which explained that Opko "[has] and may continue to make investments in other early stage companies that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder."

275.    Opko made substantially similar statements to those in ¶ 274 in its 2016 and 2017 Form 10-Ks filed during the Class Period.

276.    These statements were materially false and misleading. Contrary to the statement that Opko made "investments in early stage companies" based on their "valuable proprietary technology and significant potential to create value for OPKO as a shareholder," Opko and Frost were investing in multiple early-stage companies as part of fraudulent pump-and-dump schemes to the detriment of Opko investors.

277.    On March 1, 2018, Defendants Opko and Frost participated in a conference call with investors to discuss Opko's fourth quarter 2017 earnings (the "Fourth Quarter 2017 Conference Call"). During the Fourth Quarter 2017 Conference Call, Defendant Frost discussed Opko's business strategy with investors:

> Let's turn now to our clinical development programs. ***Our strategy is to build a diversified portfolio*** addressing a number of indications with significant unmet medical needs, limited treatment options and large markets. We have a robust pipeline of product candidates at varying stages of development, which we believe mitigates the risk inherent in relying to any one product, program or study. ***This pipeline provides attractive opportunities for creating both near and long-term value for our shareholders.***

278.    These statements were materially false and misleading. It was materially false and misleading for Frost to tout Opko's investments as based on promising biotechnologies that created "near and long-term value" for Opko shareholders, when he and Opko were involved in multiple pump-and-dump schemes, to the detriment of Opko shareholders.

### D.    Promotional Articles and Press Releases Discussing Opko's Investments in BioZone and MabVax

279.    During the Class Period, as part of the pump-and-dump schemes, Defendant Frost and his associates, including Honig and Brauser, caused Ford and O'Rourke to publish fraudulent articles on the popular investor website Seeking Alpha touting Frost's and Opko's investments in BioZone and MabVax. These articles—and, in particular, their emphasis on the role of Frost and Opko—were essential to perpetrating Defendants' pump-and-dump schemes because they

attracted Frost's significant retail-investor following, thus increasing the trading volume and share price of BioZone and MabVax and allowing the conspirators to "dump" their shares at artificially inflated prices. These articles, which highlighted Frost's and Opko's involvement as their main point of emphasis, were made and disseminated under Defendant Frost's direction, control, and ultimate authority.

280.    On September 26, 2013, as part of Defendants' pump-and-dump scheme involving BioZone, Defendant Ford published an article on Seeking Alpha entitled "***Opko and Its Billionaire CEO Invested in Biozone***." The article stated in relevant part:

> I recently established a position in BioZone Pharmaceuticals (OTC:BZNE) based on the company's undervaluation, its patented QuSomes technology, and ***the fact that Opko (OPK) and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.***) BioZone's strong patent portfolio, multibillion-dollar addressable markets, and current revenue stream, make it an ideal asymmetrical trade, with large upside potential, and limited downside risk.
>
> *        *        *
>
> BioZone has developed a new method of drug delivery, QuSomes that provides improved efficacy, reduced side effects, and lower costs. This technology will allow BioZone to reformulate and sell certain FDA approved drugs at a reduced cost, which should help BioZone capture a large percentage of these drug markets. BioZone's initial 3 drug targets are large, with total addressable markets exceeding $7 billion annually.
>
> *        *        *
>
> With insoluble drugs, a solvent needs to be added in order to break down the drug and deliver it into a patient's system. Without the solvent, the drug is rendered ineffective. But the current generations of solvents are expensive, difficult to produce, and produce severe side effects. ***BioZone has invented a second-generation solvent, QuSomes, which eliminates all these problems.***
>
> *        *        *
>
> After several conference calls with Dr. Keller, and much due diligence, I understand why Dr. Frost took such a large position in BioZone. Here are some key points: . . . **Number 3**: ***Dr. Phillip Frost and his company, Opko, have purchased 17.68 million shares of BioZone stock (about 25% of the company). In my***

*opinion they would not have taken such a large position unless BioZone's QuSomes technology was solid. I feel confident in my due diligence, but Dr. Frost and his scientific team are capable of a much higher level of scientific analysis than I could ever conduct. His large position in BioZone is a strong validation of the company's technology. . . . **Number 8**: With Opko and Dr. Frost's investment in the company, I assume Dr. Frost is offering his experience and expertise in guiding the company's development. Given his track record, this can only benefit shareholders and is one of the primary reasons I invested in BioZone.*

\* \* \*

*BioZone presents a good asymmetrical trade, large upside potential with good downside protection. The contract manufacturing segment alone is worth more than today's $34 million valuation. But the additional future revenue streams from Opko, the drug reformulation segment, and BioZone's branded generic products make BioZone tremendously undervalued. In my opinion, BioZone should be trading for more than twice today's valuation.*

281.     In short, this article represented that the investment by Frost and Opko in BioZone was legitimate, that this investment was driven by BioZone's valuable proprietary technology, and that this investment would benefit Opko shareholders. These representations were materially false and misleading. Contrary to these representations, the BioZone investment was made as part of a fraudulent pump-and-dump scheme and was to the detriment of Opko shareholders.

282.     Ford also stated at the end of the article that "I am long BioZone. I wrote this article myself, and it expresses my own opinions. *I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.*"

283.     This statement was materially false and misleading because, in truth, Ford was directed to publish the article as part of Defendants' pump-and-dump scheme and was compensated with below-market-value shares of BioZone to do so.

284.     On April 8, 2015, as part of the MabVax pump-and-dump scheme, O'Rourke published an article entitled "***Opko Spots Another Overlooked Opportunity in MabVax Therapeutics***" on Seeking Alpha under the pseudonym "Wall Street Advisors." O'Rourke drafted

and published the article at Honig's direction and under Defendant Frost's direction, control, and ultimate authority. The article repeatedly stressed the benefits of the MabVax investment to Opko shareholders, stating in relevant part:

> ***Opko Health (NYSEMKT:OPK) has a history of discerning overlooked assets in which to make strategic investments prior to value creation. Opko shareholders, in turn, get exposure to not only Opko's core assets, but also to a bevy of smaller, high growth healthcare and biotech assets. Opko has proven quite adept at then being able to monetize these investments later in their growth cycle, translating to meaningful value creation for Opko shareholders. Its path from $2 per share when it first went public to its current $14.30 share price is filled with examples of such investments. In this article, I shall take a look at Opko's most recent strategic investment in MabVax Therapeutics (OTCPK:MBVX), a cancer immunotherapy company. MabVax presents a compelling investment opportunity at its current market cap relative to its pipeline.***

*       *       *

> Opko announced on Monday it was leading an investment in MabVax Therapeutics, which raised a total of $11.6 million and counted Dr. Phillip Frost, Opko's CEO and Chairman, among investors in the round. MabVax fits the Opko mold for a strategic investment as a small market cap company advancing towards commercialization in a hot subsector within biotech, cancer immunotherapy. As a demonstration of the increased interest in this particular field, a new stock index debuted just yesterday to track the performance strictly of companies developing cancer immunotherapies. MabVax would seemingly make a good addition to this index at some point.

*       *       *

> Dr. Phillip Frost, CEO and Chairman of Opko, made the following comment regarding MabVax, "The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. ***The early data for its HuMab 5B1 antibody are encouraging and MabVax has a pipeline of dozens of novel antibody leads on its discovery platform*** from which it may select promising candidates to develop through clinical trials. MabVax's lead antibody program, HuMab 5B1, targets metastatic pancreatic and colon cancers with anticipated early Phase I data coming out by the end of 2015, for both therapeutic and diagnostic indications. ***This is a billion dollar annual market opportunity with a critical unmet medical need***, as there are very poor 5-year survival rates for metastatic pancreatic and colon cancer."

> ***It seems MabVax presents another strong case study of Opko and Dr. Frost identifying an overlooked investment opportunity.***

\*    \*    \*

***Opko's most recent addition to its investment portfolio, MabVax Therapeutics, presents a strong risk/reward value proposition.*** MabVax's current $140 million valuation appears small relative to the market potential for its progressing pipeline of technologies and relative to other comps in the market.

285.    In short, again, this article—including the quote by Defendant Frost—represented that the investment by Frost and Opko in MabVax was legitimate, that this investment was driven by MabVax's valuable proprietary technology, and that this investment would benefit Opko shareholders. These representations were materially false and misleading. Contrary to these representations, the MabVax investment was made as part of a fraudulent pump-and-dump scheme and was to the detriment of Opko shareholders.

286.    The article also stated that:

The author wrote this article themselves, and it expresses their own opinions. The author is not receiving compensation for it. ***The author has no business relationship with any company whose stock is mentioned in this article.***

287.    This statement was materially false and misleading because, in truth, O'Rourke was directed to publish the article as part of Defendants' pump-and-dump scheme.

288.    On April 6, 2015, MabVax issued a press release titled "MabVax Therapeutics Announces Closing of Financing" (the "April 6, 2015 MabVax Press Release"). In the April 6, 2015 MabVax Press Release, Defendant Frost was quoted as touting Opko's investment in MabVax. Specifically, the April 6, 2015 MabVax Press Release stated:

Commenting on the announcement, Dr. Phillip Frost, CEO and Chairman of OPKO Health, Inc., stated, "The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. The early data for its HuMab 5B1 antibody are encouraging and MabVax has a pipeline of dozens of novel antibody leads on its discovery platform from which it may select promising candidates to develop through clinical trials."

\*    \*    \*

"This financing will provide MabVax with funds to advance our pipeline of clinical products through several key milestones, and allow us to pursue additional preclinical research programs in our pipeline of which several are partnered with Memorial Sloan Kettering Cancer Center," commented David Hansen, President and CEO of MabVax. "We are proud to have OPKO Health and biotech investor and entrepreneur, Dr. Phillip Frost, lead the financing. Their input will be invaluable as MabVax advances its business plan."

\*       \*       \*

MabVax intends to use the proceeds from the financing to initiate Phase 1 trials for its HuMab 5B1 antibody later this year and to further advance other novel human antibodies in its pipeline. The HuMab 5B1 antibody is being developed as both a diagnostic and therapeutic product targeting pancreatic and colon cancer.

289.     These statements were materially false and misleading. The quote by Defendant Frost again represented that the investment by Frost and Opko in MabVax was legitimate, that this investment was driven by MabVax's valuable proprietary technology, and that this investment would benefit Opko shareholders. Contrary to these representations, the MabVax investment was made as part of a fraudulent pump-and-dump scheme, and was to the detriment of Opko shareholders.

290.     On April 8, 2015, MabVax issued a press release entitled "MabVax Therapeutics Catches Eye of Billionaire Investor Dr. Phillip Frost and OPKO Health" (the "April 8, 2015 MabVax Press Release"), which included another quote by Defendant Frost and language taken straight from Opko's SEC filings (which, as noted above, Frost signed). The April 8, 2015 MabVax Press Release stated:

Clearly the company is doing something right when it can capture the attention of investors like **Dr. Frost** and **OPKO Health**, two entities that can certainly help the company further its efforts in bringing its treatments to the clinic.

Commenting on the addition of MabVax to OPKO's list of strategic investments, **Dr. Frost** said, "***The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. The early data for its HuMab 5B1 antibody are encouraging and MabVax has a pipeline of dozens of novel antibody leads on its discovery platform from which it may select promising candidates to develop through clinical trials.***"

For MabVax shareholders, having **Dr. Frost** and OPKO on board could prove quite beneficial to the company's future success. After all the list of strategic investments for OPKO is quite impressive. ***OPKO's growth strategy includes investing in early-stage companies like MabVax that have valuable proprietary technology and significant potential to create value for the companies' own shareholders.***

291.    These statements were materially false and misleading. Again, this quote by Defendant Frost, as well as the language at the end of the press release (which was taken from Opko's SEC filings), represented that the investment by Frost and Opko in MabVax was legitimate, that this investment was driven by MabVax's valuable proprietary technology, and that this investment would benefit Opko shareholders. Contrary to these representations, the MabVax investment was made as part of a fraudulent pump-and-dump scheme and was to the detriment of Opko shareholders.

292.    On May 15, 2015, MabVax issued a press release entitled "MabVax Therapeutics Holdings, Inc. Provides Corporate Update and Reports First Quarter 2015 Financial Results" (the "May 15, 2015 MabVax Press Release"). The May 15, 2015 MabVax Press Release stated:

On April 10, 2015, the Company closed on approximately $11.7 million in a private placement ***led by OPKO Health, Inc. (NYSE: OPK) and Dr. Phillip Frost, CEO and Chairman of OPKO Health, who commented, "The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. The early data for its HuMab 5B1 antibody are encouraging and MabVax has a pipeline of dozens of novel antibody leads on its discovery platform from which it may select promising candidates to develop through clinical trials."***

\*        \*        \*

MabVax intends to use the proceeds from the financing to initiate Phase 1 trials for its HuMab 5B1 antibody later this year and to further advance other novel human antibodies in its pipeline. The HuMab 5B1 antibody is being developed as both a diagnostic and therapeutic product targeting pancreatic and colon cancer.

293.    These statements were materially false and misleading. Yet again, this quote by Defendant Frost represented that the investment by Frost and Opko in MabVax was legitimate, that this investment was driven by MabVax's valuable proprietary technology, and that this

investment would benefit Opko shareholders. Contrary to these representations, the MabVax investment was made as part of a fraudulent pump-and-dump scheme and was to the detriment of Opko shareholders.

294.    On July 1, 2015, as part of Defendants' pump-and-dump scheme and under Frost's ultimate authority, Ford published an article on Seeking Alpha entitled "MabVax: Near-Term Catalysts Could Push Shares From $2 to over $5." The article stated, in relevant part:

- ***Dr. Phillip Frost and OPKO just invested in MabVax and given Dr. Frost's track record, MabVax could be another home run trade.***

                        *       *       *

**Dr. Phillip Frost and Opko investments validate MabVax's technology**

One of the primary reasons I've invested in MabVax is based on Dr. Phillip Frost's and Opko's recent investment in the company. Dr. Frost and Opko were the lead investors in an $11.7 million deal. ***Undoubtedly Dr. Frost and his team of scientists conducted a high level of due diligence, which validates MabVax's technology.***

One of the most important questions for investors is whether or not MabVax's technology works. ***Given the size of Dr. Frost's and Opko investments, in my opinion that question has been answered in the affirmative***. In other words, Dr. Frost and Opko would not have invested in MabVax unless they believed the science was solid.

***I first became aware of Dr. Frost when I wrote about his flagship company Opko.*** At the time of my first Opko article, the shares were trading at $4, and have since risen above $19. ***Opko is a great company, and its involvement with MabVax will be positive for MabVax.***

Another example of Dr. Frost's success includes his investment in Cocrystal Pharma (OTC:COCP) at $.30 per share. Cocrystal has traded above $1.50 this year, providing more than a 5X return. ***I have done well investing in companies backed by Dr. Frost and MabVax could be one of his best performers.***

295.    These statements were materially false and misleading. These statements represented that Frost and Opko's investment in MabVax was legitimate and driven by MabVax's supposed "technology," and the investment was beneficial to Opko shareholders. In truth, the

MabVax investment was part of a pump-and-dump scheme that was detrimental to Opko's shareholders. The article was also materially false and misleading because it failed to disclose that Ford had been compensated for writing it.

296.    On October 8, 2015, MabVax issued a press release entitled "OPKO Health, Inc. Participates in Latest Round of Financing for MabVax Therapeutics" (the "October 8, 2015 MabVax Press Release"). In the October 8, 2015 MabVax Press Release, Frost stated regarding Opko's investment in MabVax that supplemental financing from a public offering "will provide MabVax with additional funds to advance the Company's lead antibody program into early clinical trials next year potentially reaching key milestones by mid-year next year."

297.    This statement was materially false and misleading. Contrary to Frost's statement that the MabVax investment was based on developing MabVax's "lead antibody program," that investment was made as part of a fraudulent pump-and-dump scheme.

**E.    Defendants' Materially False and Misleading Statements Concerning Frost's Investing Prowess and Importance to Opko's Success**

298.    Throughout the Class Period, Defendants made materially false and misleading statements concerning Defendant Frost's investing expertise and his good reputation as an investor. These statements concealed from investors that Frost was part of a fraudulent serial pump-and-dump scheme and made investment and acquisition decisions for Opko as part of this scheme, and to the detriment of Opko shareholders.

299.    In Opko's 2014 Form 10-K, filed with the SEC on February 27, 2015, and signed by Frost, Opko and Frost emphasized the importance of Frost's experience and expertise to Opko's success. Specifically, the 2014 Form 10-K stated that Opko's "success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business."

300.    Defendants Opko and Frost made substantially similar statements in Opko's 2015, 2016, and 2017 Form 10-Ks filed with the SEC.

301.    Also in the 2014 Form 10-K, Defendants Opko and Frost discussed Opko's investment portfolio, strategy, and acquisitions. In touting its approach to "strategic" acquisitions and investments, the Company stated that its "management team," including Frost, **_has significant experience in identifying, executing and integrating these transactions._**

302.    Defendants Opko and Frost made substantially similar statements in Opko's 2015, 2016, and 2017 Form 10-Ks.

303.    Also in the 2014 Form 10-K, Opko stated that its

> **_CEO [Frost] has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. . . . If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer_** and could cause a materially adverse impact on our operations, financial condition, and the value of our Common Stock.

304.    Defendants Opko and Frost made similar statements in Opko's 2015, 2016, and 2017 Form 10-Ks.

305.    These statements about Frost's good reputation, investing skill, and importance to Opko were materially false and misleading because Frost was using Opko as a vehicle to engage in a fraudulent pump-and-dump scheme to the detriment of Opko investors.

306.    On April 25, 2014, Opko filed a Form 14A with the SEC (the "April 25, 2014 Form 14A"). The April 25, 2014 Form 14A stated that Opko "is led by Dr. Frost" and touted Frost's expertise in the pharmaceutical industry as an investor, executive, and physician:

> [Frost] has successfully founded several pharmaceutical companies and overseen the development and commercialization of a multitude of pharmaceutical products. This combined with his experience as a physician and chairman and/or chief executive officer of large pharmaceutical companies has given him insight into virtually every facet of the pharmaceutical business and drug development and commercialization process. He is a demonstrated leader with keen business

understanding and is uniquely positioned to help guide our Company through its transition from a development stage company into a successful, multinational biopharmaceutical and diagnostics company.

307.   Opko made similar statements in the following filings with the SEC: Form 14A filed with the SEC on May 7, 2015; Form 14A filed with the SEC on March 25, 2016; Form 14A filed with the SEC on April 28, 2017; and Form 14A filed with the SEC on April 30, 2018.

308.   These statements were materially false or misleading because, rather than using his business savvy to make legitimate and valuable investments for Opko, Frost was engaged in a serial pump-and-dump scheme, and was using Opko as part of that scheme, to the detriment of Opko investors.

**F.   Defendants' Materially False and Misleading Schedule 13Gs**

309.   On April 10, 2015, Frost and FGIT filed a Schedule 13G with the SEC stating that Frost and FGIT had a 6.86% ownership percentage in MabVax and were only passive investors in MabVax.

310.   Frost filed four substantially similar Schedule 13Gs concerning the investments in MabVax on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018.

311.   The Schedule 13Gs were materially false or misleading because Frost and FGIT were required to instead file a Schedule 13D stating that they sought to direct and control MabVax rather than passively invest. The Schedule 13Gs were further false or misleading because Frost and FGIT concealed that Frost and FGIT were working with Honig, Stetson, O'Rourke, Brauser, and Groussman to direct and control MabVax. The Schedule 13Gs were also false or misleading because they concealed the fact that Frost, FGIT, and these associates of theirs, as a group, possessed a controlling interest in MabVax above 5%—thus contributing to Defendants' concealment of the group and its pump-and-dump scheme. Defendant Frost also failed to file a Schedule 13D for Opko, in which Opko should have disclosed both its own holdings and that it

was a member of the group exerting control over MabVax. This omission concealed the fact that Opko was part of a group with Frost, FGIT, Honig, Stetson, O'Rourke, and Groussman for the purpose of acquiring, holding or disposing of MabVax shares as part of the pump-and-dump scheme.

## IX.    LOSS CAUSATION

312.    Defendants' materially false and misleading statements alleged in this complaint directly caused the losses incurred by Lead Plaintiff and the Class. The false and misleading statements and omissions alleged above were widely disseminated to the securities markets, investment analysts, and the investing public.

313.    Defendants' misstatements and omissions alleged in this complaint artificially inflated and artificially maintained the price of Opko common stock. The artificial inflation in Opko's stock price was removed when the facts and risks misrepresented and omitted by Defendants were revealed to the market. The information was disseminated through a disclosure on September 7, 2018, which revealed the nature and extent of Defendants' fraud. This disclosure reduced the amount of inflation in the price of Opko's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

314.    Specifically, on September 7, 2018, the SEC filed a complaint against Opko alleging that Defendants Opko and Frost participated in pump-and-dump market-manipulation schemes. The SEC alleged that as part of these schemes, Frost and his associates acquired large amounts of stock in companies identifiable as BioZone/Cocrystal and MabVax, and after securing significant ownership in each company, engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and give the stocks the appearance of active trading volume. Frost's associates and (in the case of BioZone) Frost then dumped their shares into the inflated market at investors' expense. Accordingly, the SEC charged Opko, Frost, and his

associates with violating the federal securities laws and charged Opko with aiding and abetting violations of the securities laws. This disclosure corrected Defendants' prior false and misleading statements concerning, among other things, Opko's purported "strategic investments" and Frost's role in Opko's success.

315.    The September 7, 2018 disclosure of the SEC's charges alleging fraud by Opko and Frost caused Opko stock to immediately fall 18%, dropping from $5.55 per share on September 6, 2018, to $4.58 per share on September 7, 2018. At 2:34 pm on September 7, Nasdaq halted trading in Opko shares. When trading finally resumed one week later on September 14, 2018, Opko shares fell another 15%, dropping to $3.90 per share.

## X.    PRESUMPTION OF RELIANCE

316.    Lead Plaintiff and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

317.    Lead Plaintiff and Class members are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions under the fraud-on-the-market doctrine because, at all relevant times, the market for Opko common stock was open, efficient, and well developed for the following reasons, among others:

    a.    Opko common stock met the requirements for listing and was listed and actively traded on the NYSE (from the beginning of the Class Period until June 24, 2016) and the Nasdaq (from June 24, 2016 to the present), both highly efficient and automated markets;

    b.    The price of Opko common stock reacted promptly to the dissemination of new information regarding the Company. Opko common stock was actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation;

    c.    As a regulated issuer, Opko filed periodic reports with the SEC;

d.      As what the SEC calls a "well-known seasoned issuer," Opko was eligible to file registration statements with the SEC on Form S-3;

e.      Opko regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.      Opko was followed extensively by the media, and by securities analysts employed by brokerage firms who wrote numerous analyst reports about Opko during the Class Period that were distributed to those brokerage firms' sales forces and certain customers. Each of those reports was publicly available and entered the public marketplace;

g.      The material misrepresentations and omissions alleged in this complaint would tend to induce a reasonable investor to misjudge the value of Opko securities; and

h.      Without knowledge of the misrepresented or omitted material facts alleged in this complaint, Lead Plaintiff and other members of the Class purchased or acquired Opko common stock between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.

318.    As a result of the foregoing, the market for Opko common stock promptly digested current information regarding Opko from publicly available sources and reflected the information in Opko's stock price. Under these circumstances, all purchasers of Opko common stock during the Class Period suffered similar injury through their purchase of Opko common stock at artificially inflated prices, and a presumption of reliance applies.

319.    Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Opko's common stock and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

320.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

321.    None of the statements complained of in this complaint was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

322.    To the extent that any of the false and misleading statements alleged in this complaint can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As alleged above in detail, then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

323.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded in this complaint, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the false and misleading forward-looking statement was authorized or approved by an executive officer of Opko who knew that the statement was false or misleading when made.

## XII.    CLASS ACTION ALLEGATIONS

324.    Lead Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the

common stock of Opko on either a U.S.-based exchange (including the New York Stock Exchange and the Nasdaq), or on the TASE, between September 26, 2013 and September 7, 2018, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Opko at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest. For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by, or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Opko's employees.

325.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Opko shares were actively traded on the NYSE (from the beginning of the Class Period until June 24, 2016) and the Nasdaq (from June 24, 2016 through the end of the Class Period). As of April 30, 2019, Opko had 616.12 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members of the proposed Class. Class members who purchased Opko common stock may be identified from records maintained by Opko or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

326.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as alleged in this complaint.

327.    Lead Plaintiff will fairly and adequately protect Class members' interests and has

retained competent counsel experienced in class actions and securities litigation.

328.    Common questions of law and fact exist as to all Class members and predominate

over any questions solely affecting individual Class members. Among the questions of law and

fact common to the Class are:

a.    Whether the federal securities laws were violated by Defendants' acts as
      alleged in this complaint;

b.    Whether the SEC filings, press releases, reports, and other public statements
      disseminated to the investing public during the Class Period contained
      material misstatements or omitted to state material information;

c.    Whether and to what the extent the market prices of the Company's
      securities were artificially inflated during the Class Period due to the non-
      disclosures and misrepresentations alleged in this complaint;

d.    Whether Defendants acted with scienter; and

e.    Whether the members of the Class have sustained damages as a result of the
      misconduct alleged in this complaint, and if so, the proper measure of
      damages.

329.    A class action is superior to all other available methods for the fair and efficient

adjudication of this action because joinder of all Class members is impracticable. In addition, the

damage suffered by some individual Class members may be relatively small so that the burden and

expense of individual litigation make it impossible for such members to individually redress the

wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

**For Violation Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5**
**(Against Defendants Opko and Frost)**

330.    Lead Plaintiff repeats and realleges every allegation above as if fully stated in this

count.

331.     This count is asserted on behalf of all members of the Class against Defendants Opko and Frost for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

332.     During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or severely recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

333.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases or other acquisitions of Opko common stock during the Class Period.

334.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made untrue or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above materially false and misleading statements intentionally or with severely reckless disregard for the truth; employed devices and artifices to defraud in connection with the purchase and sale of Opko common stock; and engaged in acts, practices, and a course of

business that operated as a fraud or deceit, which were intended to, and did, (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Frost's connections to serial stock promoters Honig and Brauser and his history of questionable penny-stock investments, Opko's investments in BioZone, Cocrystal, and MabVax, Opko's investment strategy, Frost's investing expertise and his good reputation as an investor, and Frost's and FGIT's supposedly passive role as investors in MabVax; (b) artificially inflate and maintain the market price of Opko common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Opko common stock at artificially inflated prices and suffer losses when the true facts became known.

335.     Defendants Opko and Frost are liable for all materially false and misleading statements made during the Class Period, as alleged above.

336.     As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts alleged in this complaint, which presented a danger of misleading buyers of Opko common stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

337.     Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Opko common stock, and the inflation was removed from the prices of their shares when the true facts became known. Lead Plaintiff and the Class would not have purchased Opko common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and misconduct.

338.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged in this complaint in connection with their purchases of Opko common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendant Frost)**

339.     Lead Plaintiff repeats and realleges every allegation above as if fully stated in this count.

340.     This Count is asserted on behalf of all members of the Class against Defendant Frost for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

341.     As Chairman, CEO, and the largest stockholder of Opko, Frost was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of his position of control and authority as the highest-ranking officer and director of Opko, Frost had the power and authority to direct the management and activities of the Company and its employees and to cause the Company to engage in the wrongful conduct alleged in this complaint. Frost was able to and did control, directly and indirectly, the content of the public statements made by Opko during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged in this complaint.

342.     In his capacity as the most senior corporate officer of the Company, and as more fully described above, Frost had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial, regulatory, and legal compliance, internal-control procedures, and accounting and reporting functions. Frost signed many of the Company's SEC filings during the Class Period, as alleged above, and was directly involved in providing false information or certifying or approving the false statements disseminated by Opko during the Class

Period. Frost was also directly involved in providing false information and certifying or approving the false statements disseminated by Opko during the Class Period.

343.    As alleged above, Frost controlled and commissioned the writing of a false article about BioZone written and published by Ford on Seeking Alpha; Frost controlled and commissioned the writing of a false article about MabVax written and published by O'Rourke on Seeking Alpha; Frost controlled and commissioned a false statement by Keller in an article about BioZone written and published by Ford on Seeking Alpha; and Frost controlled the press releases issued in connection with the MabVax Pump and Dump.

344.    As a result of the foregoing, Frost was a controlling person of Opko within the meaning of Section 20(a) of the Exchange Act.

345.    As alleged above, Opko violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this complaint. By virtue of his position as a controlling person of Opko, and as a result of his own aforementioned conduct, Frost is liable under Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Opko is liable under Section 10(b) and Rule 10b-5, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Opko common stock.

346.    As a direct and proximate result of Frost's conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Opko common stock.

### COUNT III

**For Violation of the Israel Securities Law, 1968**
**(Against Defendants Opko and Frost for Purchases Made on the TASE)**

347.    Lead Plaintiff repeats, incorporates, and realleges every allegation above as if fully stated in this count.

348.    Throughout the Class Period, Opko common shares were dually listed on both a U.S. exchange (the NYSE from the beginning of the Class Period through June 24, 2016, and the Nasdaq from June 24, 2016 through the end of the Class Period) and the TASE.

349.    Israeli securities law provides unique treatment for securities of firms that are "dual listed," i.e., available for trading on both the TASE and the national U.S. stock markets. For dual-listed firms incorporated in Israel, and dual-listed firms like Opko incorporated elsewhere but approved for this treatment by the Israeli Securities Agency ("ISA"), Israeli law applies the reporting requirements (including the anti-fraud provisions) of the country of primary listing. *See* Israeli Securities Law, 1968 ("Securities Law"), §§ 1, 35T, 35DD, 35EE. In its August 19, 2013 press release announcing the joint listing of Opko stock on the TASE, the Company represented that it would "remain subject to the rules and regulations of the NYSE and of the U.S. Securities and Exchange Commission," and that "TASE links to the U.S. markets via a direct link to DTC, a subsidiary of the Depository Trust & Clearing Corporation, which facilitates the trading of dually-listed securities."

350.    Accordingly, to construe the propriety of Opko's disclosures to investors, Israel ***applies U.S. laws and regulations***, including the antifraud provisions of the U.S. securities laws, to enforce disclosure obligations for dual-listed stocks. *See* Securities Law, §§ 35T, 35DD, 35EE; *Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011. According to Israeli case law, liability for false statements and omissions by dual-listed companies like Opko is governed by Section 10(b) of the Exchange Act and Rule 10b-5, and Section 20(a) of the Exchange Act also applies to the claims arising from trades made by Lead Plaintiff and other Class Members on the TASE.

351. During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Defendants carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to, and throughout the Class Period did, (a) artificially inflate and maintain the market price of Opko common stock; (b) deceive the investing public, including Lead Plaintiff and other Class members, as alleged in this complaint; (c) cause Lead Plaintiff and other members of the Class to purchase Opko common stock at inflated prices in reliance on Defendants' false and misleading statements made knowingly or with severe recklessness by Defendants; and (d) cause them losses when the truth was revealed.

352. During the Class Period, in violation of Section 20(a) of the Exchange Act, Frost had control over Opko within the meaning of Section 20(a) of the Exchange Act when Opko made the materially false and misleading statements and omissions, employed devices and artifices to defraud, and engaged in acts, practices, and a course of business that operated as a fraud or deceit, causing damages to Lead Plaintiff and other Class members. By virtue of his executive position, board membership, and stock ownership, and his culpable participation, as alleged above, Frost had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the statements that Lead Plaintiff contends were false and misleading and the fraudulent devices and artifices and acts, practices, and course of business. Frost was provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected. Frost also controlled the other statements alleged to be false and misleading, including the false promotional articles and press releases issued as part of the pump-and-dump schemes.

353.     Alternatively, if this Court concludes that Israeli, not U.S., law applies to the claims arising from Lead Plaintiff's and other Class members' purchases of common shares on the TASE, the following provisions and causes of action apply to those claims:

a.     Regulations 3-5 of the Securities Regulations (Periodic and Immediate Reports of Foreign Corporation), 2000 promulgated under the Securities Law: Opko breached its reporting obligations under the "foreign law"—namely, U.S. law—defined in Section 1 of the Securities Law as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange." Specifically, Opko failed to submit and publicize reports, notices, and other documents of the adverse information contained in this complaint as required under U.S. law, in a timely fashion as required under U.S. law, on issues required under U.S. law. Opko thereby caused damage to Lead Plaintiff and other Class members.

b.     Section 36 of the Securities Law and Regulations 30, 36 of the Securities Regulations (Periodic and Immediate Statements), 1970 under that section: Opko failed to submit immediate reports in a timely fashion as required under Regulation 30. According to Regulation 36(a), "An [immediate] report shall provide, with respect to any event or matter that deviates from the corporation's ordinary course of business, the details of [such an event's or matter's] nature, scope or potential result which will have or could have a significant effect on the corporation; the same details will be provided with respect to any event or matter that could significantly affect the price

of the corporation's securities." Moreover, even if Opko may have delayed timely reporting under Regulation 36(b), once it became aware of rumors and other public information, it breached its obligation under Regulation 36(d) to submit an immediate report and refer in that report to the correctness of the information that has already been made public. Opko thereby caused damage to Lead Plaintiff and other members of the Class.

c.   Sections 31-32A, 34, 38B-38C of the Securities Law: Read together, these sections impose liability, *inter alia*, on a corporation, a director of a corporation, its general manager, and its controlling shareholder with regard to a misleading item that was in a report, notice, or document that the corporation filed under this Law, to anyone who sold or purchased securities in the course of trading on a stock exchange or over the counter, for damage caused to them by the inclusion of a misleading item in those disclosures. A "misleading item" is defined in Section 1 of the Securities Law as "including anything that is likely to mislead a reasonable investor, and any matter the omission of which is likely to mislead a reasonable investor." Specifically, Section 32A(c) denies the safe harbor protection for "forward looking information" under this Section from "a party that knew that the forward-looking information would not be realized." Section 32A(d) further excludes from the safe harbor's purview "facts, figures or other details in a prospectus, opinion, report, review or certificate, as applicable, which served as a basis for forward-looking information." Defendants are liable to Lead Plaintiff and other members of the Class under these provisions.

d.      Section 52K of the Securities Law: This general civil-liability provision imposes liability on an issuer, the issuer's directors, its general manager, and its controlling shareholder for any damage caused to a holder of the issuer's securities by virtue of the issuer's violation of the provisions of this Law or of regulations under this Law. Defendants are liable to Lead Plaintiff and other members of the Class under this provision.

e.      Sections 35-36 of the Torts Ordinance [New Version]: These sections impose general liability in torts for negligence towards any person where a reasonable person in like circumstances should have foreseen that in the ordinary course of things the former person may be harmed by the latter person's conduct or omission. Defendants are liable for damage caused to Lead Plaintiff and other members of the Class by Defendants' misrepresentations and omissions as detailed in the above paragraphs.

f.      Section 63 of the Torts Ordinance [New Version]: This section imposes general liability in torts for breach of statutory duty on any person who failed to comply with a duty imposed on him according to any statute, excepting this Ordinance, where the statute, according to its correct construction, is meant for the protection or benefit of another person, the breach caused damage to that person of the kind or nature of damage meant by the statute, unless that statute was meant to exclude such remedy. Defendants are liable for damage caused to Lead Plaintiff and other members of the Class by Defendants' failures to comply with their duties under the Securities Law as detailed in the above paragraphs.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.      Declaring this action to be a proper class action and certifying Lead Plaintiff as the class representative under Fed. R. Civ. P. 23;

b.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest on that amount;

c.      Awarding Lead Plaintiff and members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

d.      Awarding any equitable, injunctive, and other relief that the Court may deem just and proper.

## XV.   JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: May 3, 2019

**SAXENA WHITE P.A.**
*/s/ Joseph E. White, III*
Joseph E. White, III
Brandon T. Grzandziel
150 East Palmetto Park Road
Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
Email: jwhite@saxenawhite.com
Email: bgrzandziel@saxenawhite.com

*Liaison Counsel for Lead Plaintiff The Amitim Funds*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton (*pro hac vice*)
Adam D. Hollander (*pro hac vice*)
Brenna Nelinson (*pro hac vice pending*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: johnr@blbglaw.com
Email: adam.hollander@blbglaw.com
Email: brenna.nelinson@blbglaw.com

*Lead Counsel for Lead Plaintiff The Amitim Funds*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2019, I presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system.

*/s/ Joseph E. White, III*
Joseph E. White, III

117